**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| MICHAEL JOHNSON, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>CBD ENERGY LIMITED, NATIONAL SECURITIES CORPORATION, NORTHLAND SECURITIES, INC. GERARD MCGOWAN, RICHARD PILLINGER, TODD BARLOW, CARLO BOTTO, WILLIAM MORRO, and JAMES GREER<br><br>Defendant. | Case No.: 4:15-cv-01668<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Lead Plaintiff Mahmmoud Sakhi and Named Plaintiffs Joseph Pankowski and Dmytro Kavchak (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings by CBD Energy Limited ("CBD" or the "Company"), and analyst and other media reports about the Company. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased the common stock of CBD during the period from June 13, 2014 to October 24, 2014 (the "Class Period") pursuant and/or traceable to the Company's Registration Statement (the "Registration Statement") and Prospectus ("the Prospectus")(collectively with the Registration Statement, the "Offering Documents") issued in connection with the Company's public offering, which commenced on or about June 13, 2014 (the "Offering").[1] This Complaint seeks to recover damages to Class members caused by Defendants' violations of the federal securities laws under the Securities Act of 1933 (the "Securities Act").

2. On June 13, 2014, Defendants National Securities Corporation ("National") and Northland Securities, Inc. ("Northland") served as underwriters of CBD's Offering and sold $7,240,000 of CBD stock to investors by means of the false and misleading Offering Documents.

3. In the Offering, 1,810,000 shares of the Company's common stock were priced at $4.00 per share for total proceeds to CBD of $7,240,000.

4. The Offering Documents, which included the Company's financial results dating back to 2012, contained misstatements of material fact. Namely, the Offering Documents:

- Overstated equity by AU $14,623,000 or 124.8% as of June 30, 2012 and by AU $10,710,000 or 843.3% as of June 30, 2013;
- Overstated total assets by AU $15,101,000 or 26.3% as of June 30, 2012 and by AU $10,307,000 or 23.9% as of June 30, 2013.

[1]The Offering Documents are incorporated herein by reference.

- Overstated revenue by AU $6,308,000 or 12.6% for the year ending June 30, 2012 and by AU $5,798,000 or 8.3% for the year ending June 30, 2013;
- Understated net loss by AU $14,623,000 or 36.4% for the year ending June 30, 2012; and
- Failed to disclose material related party “self dealing” transactions involving CBD’s Managing Director and Chairman, Defendant McGowan.

5. PricewaterhouseCoopers and PricewaterhouseCoopers - Australia Firm audited CBD's financial statements included in the Offering Documents.

6. On October 23, 2014, after discussions with the Auditor Defendants, CBD's Audit Committee determined that there was sufficient uncertainty about the accuracy of related party disclosures involving Defendant McGowan, and therefore CBD's previously issued audited financial statements for the fiscal years ended June 30, 2012 (the "2012 Financial Statements") and June 30, 2013 (the "2013 Financial Statements") should no longer be relied upon.

7. On October 24, 2014, the Company issued a press release admitting that CBD's previously issued 2012 Financial Statements, 2013 Financial Statements, and unaudited consolidated financial statements for the six month period ended December 31, 2013 (the "December Statements"), included in the Offering Documents, contained material errors, violated Generally Accepted Accounting Principles ("GAAP"), and must be restated. Accordingly, investors were told that CBD’s financial statements could no longer be relied upon.

8. This announcement shocked the market and caused the price of CBD stock to drop $0.76 per share or over 37% to close at $1.25 per share on October 24, 2014.

9. It is an unprecedented failure that a mere four months after the public Offering was completed, CBD had to issue a notice of non-reliance and had to restate its financial statements which were including in the Offering Documents.

**JURISDICTION AND VENUE**

10. The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, and the rules and regulations of the SEC promulgated thereunder.

11. This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and 28 U.S.C. § 1331.

12. Venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b).

13. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

14. Lead Plaintiff Mahmmoud Sakhi, as set forth in his certification previously filed with the Court as Dkt. No. 12-5, incorporated by reference herein, purchased 36,100 shares of CBD common stock pursuant to or traceable to CBD's Offering and was economically damaged as a result of Defendants' violations of the securities laws.

15. Named Plaintiff Joseph Pankowski, as set forth in his accompanying certification, purchased 1,500 shares of CBD common stock on June 13, 2014, issued pursuant to or traceable to CBD's Offering as he purchased directly from Defendant National. Plaintiff Pankowski was

economically damaged as a result of Defendants' violations of the securities laws. His PSLRA certification is attached hereto as **Exhibit 1.**

16. Named Plaintiff Dmytro Kavchak, as set forth in his accompanying certification, purchased 5,000 shares of CBD common stock, issued pursuant to or traceable to CBD's Offering and was economically damaged as a result of Defendants' violations of the securities laws. His PSLRA certification is attached hereto as **Exhibit 2**.

17. Defendant BlueNRGY Group Limited (Formerly known as CBD Energy Limited) (Australian Business Number 88-010-966-793), is an Australian corporation headquartered in Sydney, Australia. Founded in 1989, it purportedly provides clean, renewable, and cost-effective sources of electricity for consumers on three continents. In or around March 19, 2015, CBD shareholders voted to rename the Company to BlueNRGYGroup Limited ("BlueNRGY"). On March 20, 2015, CBD was officially renamed BlueNRGY Group Limited. For the purposes of this amended complaint, "CBD" refers to both CBD and BlueNRGY. CBD's common stock was traded on the NASDAQ under the symbol "CBDE." Trading of CBD stock was halted on November 12, 2014 and has not resumed. On July 22, 2015, NASDAQ filed a Form 25 with the SEC to begin delisting CBD.

18. Defendant CBD Energy USA Limited ("CBD USA") is a wholly ownedsubsidiary of CBD with its principal activity focused on solar energy installation. CBD USA is located in New York, New York. CBD USA signed the Registration Statement for the Offering.

19. Defendant Gerard McGowan ("McGowan") has been the Company's Managing Director and its Chairman of the Board of Directors ("Board") at all relevant times. Defendant McGowan took a 30-day leave of absence beginning on October 24, 2014. On November 14, 2014, Defendant McGowan was suspended as CBD's Managing Director and removed as a

director of the Company. Effective on December 30, 2014, Defendant McGowan resigned as a director of CBD. Defendant McGowan signed the Registration Statement for the Offering.

20. Defendant Richard Pillinger ("Pillinger") has been the Company's Chief Financial Officer ("CFO") at all relevant times. Defendant Pillinger signed the Registration Statement for the Offering.

21. Defendant Todd Barlow ("Barlow") has been a member of the Company's Board at all relevant times until he was replaced in August 2014. Defendant Barlow served on CBD's Audit Committee for the fiscal years ending June 30, 2013 and 2014. On July 18, 2014, Defendant Barlow resigned as a director of the Company. Pursuant to a power of attorney, Defendant McGowan signed the Registration Statement for the Offering on Defendant Barlow's behalf.

22. Defendant Carlo Botto ("Botto") has been a member of the Company's Board at all relevant times and served on CBD's Audit Committee for the fiscal year ending June 30, 2013. On February 9, 2015, Defendant Botto was reappointed to the Audit Committee. Pursuant to a power of attorney, Defendant McGowan signed the Registration Statement for the Offering on Defendant Botto's behalf.

23. Defendant William Morro ("Morro") has been a member of the Company's Board at all relevant times and served as the Chairman of CBD's Audit Committee for the fiscal year ending June 30, 2014. On February 9, 2015, Defendant Morro was appointed as CBD's Managing Director. Defendant Morro signed the Registration Statement for the Offering.

24. Defendant James Greer ("Greer") has been the Company's CEO of International Operations at all relevant times. Defendant Greer is employed by CBD USA. Pursuant to a

power of attorney, Defendant McGowan signed the Registration Statement for the Offering on Defendant Greer's behalf.

25. Defendant Patrick Lennon ("Lennon") is CBD's Senior Vice President of Wind and Off Grid Solutions. Defendant Lennon is listed as a director and executive officer of CBD in "Management" section of CBD's Registration Statement.

26. Defendants McGowan, Morro, Barlow, Botto, Pillinger, Greer, and Lennon are referred to here, collectively, as the "Individual Defendants."

27. Defendant National was the sole book-running manager and an underwriter of the Company's Offering. National was allocated 1,448,000 of the 1,810,000 shares to be sold in the Offering. National assisted in the preparation and dissemination of the Offering Documents. As an underwriter of the Offering, National was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Documents.

28. Defendant Northland was the co-manager and underwriter of the Company's Offering. Northland was allocated 362,000 of the 1,810,000 shares to be sold in the Offering. National assisted in the preparation and dissemination of the Offering Documents. As an underwriter of the Offering, Northland was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Documents.

29. Defendants National and Northland are referred to here, collectively, as the "Underwriter Defendants."

30. Defendant PricewaterhouseCoopers LLP ("PWC LLP") is a certified public accountant and was the Company's independent auditor at all relevant times. PWC LLP provided audit opinions included in the Offering Documents.

31. Defendant PricewaterhouseCoopers - Australian Firm ("PWC Australia") (Australian Business Number 52 780 433 757) is a certified public accountant and was the Company's independent auditor at all relevant times. PWC Australia provided audit opinions included in the Offering Documents.

32. Defendants PWC LLP and PWC Australia are referred to here, collectively, as the "Auditor Defendants" or "PWC."

33. CBD, the Individual Defendants, the Underwriter Defendants, and the Auditor Defendants are referred to here, collectively, as "Defendants."

## DEFENDANTS' VIOLATIONS OF THE SECURITIES LAWS

### ***CBD's Inaccurate Offering Documents***

34. On June 4, 2014, CBD filed with the SEC its amended Registration Statement on Form F-1/A with the SEC.

35. On June 12, 2014, the SEC declared the Registration Statement effective.

36. The final Prospectus was filed with the SEC on June 16, 2014.

37. The Offering closed on June 18, 2014.

38. In the Offering, the Underwriters sold 1,810,000 shares of CBD stock at $4.00 per share. Total proceeds from the Offering were $7,240,000.

39. The Underwriter Defendants distributed the Offering Documents to solicit and persuade investors to purchase shares of CBD stock in the Offering.

40. The Offering Documents were the main instruments that the Underwriter Defendants used to convince Class members to purchase shares of CBD stock in the Offering.

41. The Offering Documents contained CBD's audited consolidated 2012 Financial Statements and 2013 Financial Statements prepared by PWC, as well as CBD's unaudited consolidated December Statements.

42. The Offering Documents had the effect of artificially inflating the value of CBD's common stock.

43. On October 24, 2014, the Company issued a press release announcing that investors could no longer rely upon CDB's previously issued 2012 and 2013 Financial Statements and December Statements and that its financial statements must be restated.

44. CBD's restatement of the 2012 Financial Statements and 2013 Financial Statements, included in the Offering Documents, was necessary to (i) address previously undisclosed related party transactions and (ii) correct material errors in the income statementsfor the years ending June 30, 2012 (the "2012 Income Statement") and June 30, 2013 (the "2013 Income Statement") and balance sheets as of June 30, 2012 (the "2012 Balance Sheet"), and June 30, 2013 (the "2013 Balance Sheet") included in the Offering Documents.

45. The Offering Documents contained material errors relating to the Company's accounting treatment of related party transactions for the 2012 Financial Statements and 2013 Financial Statements. These financial statements were false and misleading because they failed to disclose material related party transactions with Defendant McGowan which had an impact on the accuracy of the 2012 and 2013 Income Statements and 2012 and 2013 Balance Sheets.

46. The Offering Documents were false and misleading because they failed to disclose material related party transactions involving Defendant McGowan including:

- Defendant McGowan receiving reimbursements from CBD and its subsidiaries in the amounts of $121,900 and $134,100 that were outside the Company's customary approval process.
- In December 2013, CBD paying $676,000 to Solon AG, a past supplier to CBD and manufacturer of solar photovoltaic panels (technology that converts sunlight into electricity). The payment was solely initiated by Defendant McGowan and it cannot be verified that the payment was not for the personal benefit of Defendant McGowan.
- During the years ended June 30, 2012, 2013 and 2014, CBD entered into a series of transactions with Sligo Investments Limited ("Sligo") in which Defendant McGowan was the sole intermediary. CBD issued Series 1 Convertible Notes to Sligo on two occasions which accrued interest and charges giving Sligo US $1,561,093 (AU $1,661,000) which were exchanged for 390,273 ordinary shares of CBD in June 2014. On the June 30, 2014 balance sheet, however, the balance for Series 1 Notes issued to Sligo was $0.
- In October 2013, Sligo loaned CBD $900,000 for working capital. A fee of $70,000 and interest of $6,410 was charged on the loan prior to repayment in December 2013. CBD's repayment of the loan was made to TRW Holdings Pty Limited, a private investment and advisory firm controlled by Defendant McGowan who is the principal shareholder.

47. Accordingly, the Offering Documents were false and misleading as the 2012 and 2013 Financial Statements did not properly account for the related material party transactions rendering the 2012 and 2013 Income Statements and 2012 and 2013 Balance Sheets inaccurate.

48. The Offering Documents contained other material errors because the December Statements failed to properly record: (i) the full (or any) recoverable value in connection with a deposit of approximately $680,000 recorded as a current asset; (ii) approximately £575,000 of capitalized expenditures in connection with the Company's offering of Secured Energy Bonds; (iii) goodwill and impairment; and (iv) certain expenses.

49. As detailed further in ¶¶89-95 below, the 2012 and 2013 Financial Statements included in the Offering Documents were false because they, *inter alia*:

- Overstated equity by AU $14,623,000 or 124.8% as of June 30, 2012 and by AU $10,710,000 or 843.3% as of June 30, 2013;
- Overstated total assets by AU $15,101,000 or 26.3% as of June 30, 2012 and by AU $10,307,000 or 23.9% as of June 30, 2013.
- Overstated revenue by AU $6,308,000 or 12.6% for the year ending June 30, 2012 and by AU $5,798,000 or 8.3% for the year ending June 30, 2013;
- Overstated goodwill and other intangible assets by AU $11,232,000 or 49.3% as of June 30, 2012 and by AU $8,232,000 or 51.8% as of June 30, 2013; and
- Understated net loss by AU $14,623,000 or 36.4% for the year ending June 30, 2012.

***The Offering Documents Were Not Prepared In Accordance With GAAP***

50. GAAP constitutes standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

51. GAAP is the common set of accounting principles, standards, and procedures that public companies trading in the United States use to compile their financial statements.

52. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). A Statement of Financial Accounting Standards ("SFAS") is a formal document issued by the FASB which details accounting standards and guidance of the FASB's accounting policies. A SFAS is issued with the expectation that companies listed on a stock exchange in the United States will adhere to it.

53. Management retains responsibility for preparing financial statements that conform with GAAP. The American Institute of Certified Public Accountants ("AICPA") Professional Standards provide:

> The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

AIPCA, Professional Standards, vol. 1, AU § 110.02 (1998).

54. The Offering Documents falsely stated that CBD's financial statements were audited in accordance with Public Company Accounting Oversight Board ("PCAOB") standards.

Financial statements which conform to PCAOB standards are also in accordance with GAAP. AU 410.

55. SEC and NASDAQ rules and regulations require that financial statements included in a registration statement or prospectus must comply with GAAP. *See* Regulation S-X.

56. SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

57. Under GAAP "restatements" are required for material accounting errors that existed at the time financial statements were prepared. *See* SFAS 154; FASB Accounting Standards Codification ("ASC") 250.

58. An accounting "error" is a term of art and results from, among other things, an error in recognition, measurement, or mistakes in the application of GAAP. SFAS 154; ASC 250.

59. Errors result from (i) mathematical mistakes, (ii) mistakes in application of GAAP, or (iii) oversight or misuse of facts that existed at the time the financial statements were prepared. SFAS 154, ASC 250.

60. CBD's restatements were caused primarily by the misuse of facts and the failure to apply properly its accounting policies that complied with GAAP.

61. A restatement is a *prima facie* showing that the financial statements were false.

62. The need to restate CBD's 2012 and 2013 Financial Statements is an admission that the 2012 and 2013 Financial Statements did not comply with GAAP and were therefore materially false and misleading.

***GAAP Requires Defendants To Disclose Related Party Transactions***

63. GAAP, SFAS, and SEC Regulation S-K ("Reg. S-K") mandate the disclosure of all material related party transactions.

64. SFAS No. 57 and ASC No. 850 provide that a public company's "[f]inancial statements shall include disclosures of material related party transactions." SFAS No. 57 ¶ 2; ASC 850-10-50-1.

65. "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." SFAS No. 57 ¶ 1; ASC 850-10-05-3. "Affiliate" includes any company that is under common control or management with the public company. SFAS No. 57 ¶ 24(a, b); ASC 850-10-20.

66. Disclosures of related party transactions shall include (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. SFAS No. 57 ¶ 2; ASC 850-10-50-1.

67. In its Form 6-K filed with the SEC on October 24, 2014, CBD admitted that the Company had to restate its 2012 and 2013 Financial Statements and the December Statements because the Company failed to disclose related party transactions in the Offering Documents and during the Class Period. These lack of disclosures of the related party transactions was a violation of GAAP and PCAOB standards.

68. Restatements are required for material accounting errors that existed at the time financial statements were prepared. *See* SFAS 154.

69. The failure to disclose the related party transactions herein was a misuse of facts that were actually known – or should have been known – to Defendants at the time they signed and filed CBD's Offering Documents the SEC.

70. Reg. S-K (together with the General Rules and Regulations under the Securities Act of 1933 ["Securities Act"] and the forms under the Securities Act) states the requirements applicable to the content a registration statement. (*See*, Reg. S-K, §229.10).

71. Reg. S-K at Section 229.404, Item 404, required, at all times during the Class Period, that the Company "[d]escribe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."

72. Reg. S-K required the disclosure of detailed information concerning related party transactions exceeding $120,000, including the names of the "related person" or entity participating in the transaction, and the amounts of the transaction.

73. Reg. S-K Section 229.303, Item 404 (b)(1)(6) also mandates disclosure of any other relationships that the registrant is aware of between the nominee or director and the registrant that are substantially similar in nature and scope to those relationships listed in paragraphs (b)(1) through (5).

74. A "related person" is defined by Reg. S-K as including any director or executive officer of the Company, any nominee for director, or any immediate family member of a director

or executive officer of the registrant, or of any nominee for director or any 5% or greater shareholder.

75. CBD's 2012 and 2013 Financial Statements were prepared in accordance with International Financial Reporting Standards ("IFRS").

76. IFRS, as issued by the International Accounting Standards Board ("IASB"), are substantially the same as GAAP as they both require disclosure of related party transactions.

77. International Accounting Standard ("IAS") 24 requires disclosure in the financial statements of related party transactions. The definition of related parties is materially the same as that found in SFAS 57.

**THE RESTATEMENT**

***The Undisclosed Related Party Transactions***

78. CBD's Offering Documents failed to disclose material related party transactions involving Defendant McGowan.

79. The undisclosed related party transactions personally benefited Defendant McGowan and were not arms' length transactions.

80. According to CBD's Form 20-F for the year ending June 30, 2014, filed with the SEC on June 1, 2015, (the "2014 20-F"), CBD admitted that it failed to disclose and should have disclosed related party transactions involving Defendant McGowan. Subsequently, on July 10, 2015, CBD filed a Form 20-F/A with the SEC (the "2014 20-F/A"). All references to the 2014 20-F mean both the 2014 20-F and the 2014 20-F/A.

81. The 2014 20-F stated in relevant part:

> ***Between July 1, 2014 and his suspension on October 24, 2014, a series of payments were made to a Director, Mr. McGowan from the Company and its subsidiaries totalling $121,900 outside of the Company's customary approval processes and were purported by Mr. McGowan to***

> ***be for reimbursement of costs incurred on behalf of the company paid by himself.*** The Company has not been provided with adequate documentation by Mr. McGowan to determine whether or not these costs represent bona fide costs incurred on behalf of the Company. These payments have been recognised as an expense in our fiscal year 2015.
>
> * * *
>
> ***A series of payments were made to Mr. McGowan from the Company and its subsidiaries totaling $134,100 outside of the Company's customary approval processes and were purported by Mr. McGowan to be for reimbursement of costs incurred on behalf of the company paid by him***. The Company has not been provided with adequate documentation by Mr. McGowan to determine whether or not these costs represent bona fide costs incurred on behalf of the Company. These payments have been recognised as an expense in profit or loss for the year ended June 30, 2014.
>
> (Emphasis added).

82. The 2014 20-F also discussed related party transactions, which benefited Defendant McGowan,between CBD and Solon AG, stating in relevant part:

> ***An amount of $676,000 was paid to Solon AG in December 2013 which was solely initiated by a Director, Mr Gerry McGowan (no longer a director) outside of the customary approval processes of the Company. Mr McGowan represented to the Company that the payment was a deposit for a future order of Solar PV panels from Solon, however the Company has been unable to confirm that such an order was placed or accepted***. Despite attempts to independently verify the nature of this transaction and the validity of the supporting documentation, the Company has been unable to do so and cannot be assured that it was not made for the personal benefit of Mr McGowan. ***A payment was received by the Company in October 2014 for $680,000 from a third party. Documentation was provided to the Company in relation to this transaction which stated that this payment was consideration for the assignment of the alleged deposit by Solon to the party remitting the payment.*** In absence of definitive information to the contrary the amount of $676,000 is recorded within Other Assets in the Statement of Financial Position at June 30, 2014. The funds received in October 2014 will be credited against Other Assets unless additional information is obtained by the Company to contradict this accounting treatment.
>
> (Emphasis added).

83. The 2014 20-F details related party transactions, which benefited Defendant McGowan, between CBD and Sligo Investments Limited, stating in relevant part:

(f) Transactions with Sligo Investments Limited

> ***During the years ended June 30, 2014, 2013 and 2012 the Company entered into a series of transactions with Sligo Investments Limited. These transactions were all conducted with Mr McGowan acting as the sole intermediary between the Company and Sligo. The Company and its Board of Directors have been unable to determine the identity of the parties who either own or control Sligo and have also been unable to determine the incorporation status of Sligo. Despite attempts to determine the facts surrounding Sligo, the Company cannot be assured that it is not a related entity to Mr McGowan.***
>
> During the year ended June 30, 2012 the Company issued Series 1 Convertible Notes with a face value of US$1,000,000 to Sligo. On subscription to the Series 1 Convertible Notes 15,723 warrants were issued to Sligo with an exercise price of US$15.90($16.92) and an expiry date of May 31, 2017. A further 24,245 warrants with an exercise price of US$15.90($16.92) and an expiry date of May 31, 2017 were issued to Sligo during the 2013 financial year following an amendment to the Series 1 Convertible Notes. Interest and fees were incurred on these notes in the year ended June 30, 2014 of US$235,005($250,000) (2013: US$348,676($371,000); 2012: $Nil). These charges were incurred on the same terms as for all Series 1 Noteholders. In June 2014 the Series 1 Notes held by Sligo and all accrued interest and charges totalling US$1,561,093($1,661,000) were exchanged for 390,273 ordinary shares in the Company. At June 30, 2014 the balance on the Series 1 notes issued to Sligo was $Nil.
>
> ***In October 2013, Sligo loaned the Company $900,000 for working capital purposes under a loan agreement between Sligo and the Company. An arrangement fee of $70,000 and interest of $6,410 was charged on the loan prior to its repayment in December 2013. Under the sole direction of Mr McGowan, the repayment was made to TRW Pty Limited in satisfaction of this loan, as confirmed by documentation received from Sligo subsequent to the repayment.***
>
> (Emphasis added).

84. The 2014 20-F includes that the Auditor Defendants notified CBD that there were material weaknesses in the Company's financial controls as the 2014 20-F states in relevant part:

> Notice of material control weaknesses and investigation of possible contraventions of the Corporations Act
>
> The Audit Committee received notices from PwC that PwC has identified material weaknesses in financial controls and had identified the possibility of misconduct and contraventions of the Australian Corporations Act 2001 (Cth) (the 'Act') by the Company and involving the Company's Executive Chairman and Managing Director, Mr. McGowan.

***Restated Balance Sheets and Income Statements***

85. On October 24, 2014, the Company issued a press release announcing the non-reliance of and restatement of its previously issued 2012 and 2013 Financial Statements and December Statements, which states in relevant parts:

> CBD Energy Limited (CBDE) ("CBD") announced today in a filing with the SEC on Form 6-K that the Company, through its Audit Committee, and in concert with PricewaterhouseCoopers, its independent registered public accounting firm, has determined that ***its audited Financial Statements for the 2012 and 2013 Fiscal Years, and its unaudited interim financial statements as of and for the six months ended December 31, 2013 (the "December Statements") cannot be relied upon, and revisions are required.***
>
> ***In the case of the audited financial statements for Fiscal Years 2012 and 2013, the determination of non-reliance is related solely to uncertainty about the completeness and accuracy of disclosures with respect to related party transactions.*** It is anticipated that revisions will impact footnotes to the financial statements, and that no material revisions will be required to be made to the Statements of Operations or Balance Sheets related to those periods.
>
> ***With respect to the December Statements, in addition to uncertainty about disclosures of related party transactions, there are also uncertainties as to whether:***
>
> ***- the full (or any) value is recoverable in connection with a deposit of approximately $680,000 recorded as a current asset;***

***- some or all of approximately £575,000 of expenditures capitalized in connection with the Company's offering of Secured Energy Bonds should have been expensed under the highly technical requirements of AASB139 Financial Instruments: Recognition and Measurement ;***

***- disclosures regarding goodwill were adequate and some impairment should have been recognized;***

***- certain expenses should have been classified in different categories.***

The Company's Audit Committee is conducting a review of the foregoing issues and the Company is not currently aware of any other accounting errors requiring adjustment to any prior period Financial Statements; however, the possibility remains that adjustments or supplementary disclosures will be required in addition to those noted. As a consequence of the review, the Company expects a delay in completing its audit of 2014 Fiscal Year Financial Statements and to file its annual report on Form 20-F after the regulatory deadline. Nevertheless, the Company intends to do so as soon as practicable.

***Mr. Gerard McGowan, the Company's Executive Chairman and Managing Director, is the potentially related party referenced above, and he proposed to take a voluntary leave for 30 days.*** This action was unanimously approved by the Board to avoid any doubt that the Audit Committee could conduct its review in the most expeditious and independent manner. Mr. William Morro, Chairman of the Company's Audit Committee, has also been appointed as non-executive Chairman of CBD. On an interim basis, the Executive Committee of the Board, also chaired by Mr. Morro, is providing executive guidance and ensuring continuity of decision-making.

Mr. Morro stated, "It is constructive that Gerry has chosen to recuse himself from the business during the Audit Committee review and committed to cooperate fully to facilitate a quick and definitive conclusion to the Audit Committee's assessment and as rapid a completion of the Fiscal Year 2014 audit as possible. In addition, Gerry will be available to the Board and management during his leave to ensure that the ongoing operations of the Company are not disrupted. The Board is confident that CBD's capable business unit managers on three continents will continue to carry out the Company's strategies and execute on its business plans with minimal disruption during Gerry's leave. These plans include the ramp-up of residential solar sales in the US, which was kicked off last week with the completion of the first Westinghouse Solar US installation and that business unit's initial recognition of revenue."

(Emphasis added).

86. On that same day, the Company filed a Form 6-K with the SEC expounding on the non-reliance of its previously issued 2012 and 2013 Financial Statements and December Statements, which states in relevant parts:

> **Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**
>
> ***On October 23, 2014, the Audit Committee, after discussions with PricewaterhouseCoopers ("PwC"), the Company's independent registered public accounting firm, determined that there was sufficient uncertainty about the accuracy of disclosures about related-party transactions involving its Executive Chairman and Managing Director, Mr. McGowan, that its previously issued audited financial statements for the fiscal years ended June 30, 2013 and 2012 should no longer be relied upon.*** The Audit Committee is exploring the uncertainties and, if required, the Company will file restated audited financial statements for its 2012 and 2013 fiscal years as soon as practicable. The Company is not currently aware of any accounting errors requiring adjustment to any prior period audited financial statements, however, there can be no assurances that the Company or PwC will not find accounting errors requiring adjustments or amended disclosures applicable to those or earlier periods.
>
> ***On October 23, 2014, the Audit Committee determined that the interim financial statements as of and for the six months ended December 31, 2013 should no longer be relied on because of uncertainty about:***
>
> - ***the accuracy of disclosures about related-party transactions occurring during the period and involving Mr. McGowan;***
> - ***whether there is an expectation of the Company realizing full value or any value from a payment made in December of approximately $680,000 that was recorded as a deposit during the period and included in current assets and, if an impairment is warranted, when that impairment should have been applied;***
> - ***the adequacy of disclosures regarding goodwill and the possibility that an impairment of goodwill might be appropriate;***
> - ***whether the capitalization of certain payments related to the costs of issuing retail bonds in the United Kingdom, currently believed by the Company to be, in the aggregate, up to approximately £575,000, was appropriate giving effect to the specific requirements of AASB139 Financial Instruments: Recognition and Measurement and, if not, whether some or all of the amount capitalized should be recognized as an expense during the period;***

> - ***whether some of the expenses recorded during the period should be classified in different categories; and***
>
> - ***whether other provisions and additional expenses that could be material may need to be recognized in the period that cannot be estimated at this time.***
>
> The Audit Committee is exploring the uncertainties affecting the financial statements as of and for the six months ended December 31, 2013 and, if warranted, the Company will disclose adjustments thereto as soon as practicable.
>
> (Emphasis added).

87. The 2014 20-F included the restated financial statements for the fiscal years ending June 30, 2012 and 2013. For the purposes of this Complaint, the "reported" figures are the numbers found in the Offering Documents. The "restated" figures are the updated numbers included in the 2014 20-F.

88. The reported and restated balance sheet as of June 30, 2012 (the "Restated 2012 Balance Sheet"), with the percentage either overstated or understated, is attached hereto as **Exhibit 3**.

89. The Restated 2012 Balance Sheet demonstrates that the 2012 Balance Sheet was false and misleading as it either overstated or understated line items by material amounts, including:

- Inventories which were overstated by AU $4,078,000 or 21.8% in the Offering Documents;
- Other Current Assets which were overstated by AU $1,040,000 or 82.6% in the Offering Documents;
- Goodwill and other intangible assets which were overstated by AU $11,232,000 or 49.3% in the Offering Documents; and

- Total equity which was overstated by AU $14,623,000 or 124.8% in the Offering Documents.

90. CBD's income statement for the year ended June 30, 2012 with the reported and restated figures (the "Restated 2012 Income Statement") is attached hereto as **Exhibit 4**.

91. The Restated 2012 Income Statement demonstrates that the 2012 Income Statement was false and misleading as it either overstated or understated line items by material amounts, including:

- Revenues from continuing operations which were overstated by AU $6,308,000 or 12.6% in the Offering Documents;
- Impairment of intangible assets was overstated by AU $10,891,000 or 1,693% in the Offering Documents;
- Loss from continuing operations before income taxes was overstated by AU $13,157,000 or 35.3% in the Offering Documents; and
- Net loss for the period was understated by AU $14,623,000 or by 36.4% in the Offering Documents.

92. The reported and restated balance sheet as of June 30, 2013 (the "Restated 2013 Balance Sheet"), with the percentage difference between the reported and restated figures, is attached hereto as **Exhibit 5**.

93. The Restated 2013 Balance Sheet demonstrates that the 2013 Balance Sheet was false and misleading as it either overstated or understated line items by material amounts, including:

- Inventories which were overstated by AU $1,416,000 or 87.9% in the Offering Documents;

- Other Current Assets which were overstated by AU $80,000 or 17.3% in the Offering Documents;
- Goodwill and other intangible assets which were overstated by AU $8,232,000 or 51.8% in the Offering Documents; and
- Total Equity which was overstated by AU $10,710,000 or 843.3% in the Offering Documents.

94. CBD's income statement for the year ended June 30, 2013 with the reported and restated figures (the "Restated 2013 Income Statement") is attached hereto as **Exhibit 6**.

95. The Restated 2013 Income Statement demonstrates that the 2013 Income Statement was false and misleading as it either overstated or understated line items by material amounts, including:

- Revenues from continuing operations which were overstated by AU $5,798,000 by 8.3% in the Offering Documents; and
- Finance Costs were overstated by AU $1,452,000 or 15% in the Offering Documents.

96. Defendants should have recognized the overt misstatements on the 2012 and 2013 Balance Sheets as well as the 2012 and 2013 Income Statements before publishing the financial statements in the Offering Documents. Defendants were negligent to allow these materially incorrect figures to be included and distributed to investors. A simple inquiry or investigation would have revealed the inaccuracies and the undisclosed related party transactions.

97. When CBD announced the 2012 and 2013 Financial Statements could no longer be relied upon, it shocked the market and caused the price of CBD stock to plummet $0.76 per share or over 37% to close at $1.25 per share on October 24, 2014.

98. On December 2, 2014, CBD filed a Form 6-K with the SEC announcing PWC's resignation as CBD's auditor which took effect on November 10, 2014. The 6-K states in relevant part:

> **Resignation of Registered Independent Public Accounting Firm**
>
> Effective November 10, 2014, PricewaterhouseCoopers ("PwC"), the registered independent public accounting firm for CBD Energy Limited (Administrators Appointed) (the "Company"), resigned from its role as auditor of the Company's financial statements in connection with the Company's US legal and regulatory requirements, having concluded that it is not independent of CBD under applicable PCAOB rules due to non-payment of its professional fees by the Company.
>
> In its resignation letter, PwC noted that it did not presently have any disagreement with the Company on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, recognizing, however, that the Company continues to review certain accounting and governance issues (the "Investigation"), described both in the Company's October 24, 2014 Report of Foreign Private Issuer on Form 6-K (the "October 6-K") and in PwC's contemporaneous communications to the Company's Board of Directors (the "Board"). These communications expressed concerns about the adequacy of the Company's remedial response to, among other matters, necessary enhancements to internal controls, books and records, and governance. Specifically, in its resignation letter, PwC stated that "the adequacy of the Company's review of, and response to, these issues has not yet been resolved to our satisfaction and we are not in a position to predict whether the Company's remedial responses would have been resolved to our satisfaction." PwC also advised the Company that:
>
> – had it not resigned before completion of its audit of the Company's financial statements for its 2014 fiscal year, it would have needed to significantly expand the scope of its audit; and
> – the results from PwC's significantly expanded audit scope, together with results of the Investigation, may have prevented it from rendering an unqualified audit report and/or being able to rely on management's representations or be associated with the Company's financial statements
>
> In light of PwC's resignation and the Company's disclosure in its October 6-K that its previously issued audited financial statements for the fiscal years 2012 and 2013 and its unaudited interim financial statements as of and for the six months ended December 31, 2013 should no longer be relied upon, the Company is evaluating alternatives for reissuing historical

> financial statements and finalizing its audit of financial statements for its 2014 fiscal year as soon as practicable. Notwithstanding the Company's intentions, there is no assurance that the Company will be able to bring its periodic financial statement reporting into compliance with the requirements of the U.S. Securities and Exchange Commission ("SEC") or with the listing rules of the Nasdaq Stock Market ("NASDAQ") and if it is not able to do so, the Company will not be able to maintain its standing as a Registrant under applicable SEC regulations. The resignation of the Company's auditors, the restatement of audited financial statements for the fiscal years 2012 and 2013, and the adjustments (if warranted) to the unaudited interim financial statements as of and for the six months ended December 31, 2013 are being considered by the Administrator (as defined below) as part of any potential restructuring process and importantly, the restatement process will only be progressed in circumstances where a viable restructuring proposal can be formulated.
>
> On November 25, 2014, we furnished PwC with a copy of this portion of this Report of Foreign Private Issuer on Form 6-K (the "Report"), providing PwC with the opportunity to inform the Company whether it agrees with the statements made by us herein with regards to PwC. On November 26, 2014, PwC informed the Company that it concurs with the statements made by us herein with regards to PwC

***<u>The Aftermath of the Truth and Subsequent Events</u>***

99. Beginning on October 24, 2014, Defendant McGowan took a 30-day leave of absence. On November 14, 2014, Defendant McGowan was suspended as CBD's Managing Director and removed as a director of the Company. Defendant McGowan resigned as a director of CBD effective December 30, 2014.

100. On November 13, 2014, NASDAQ halted the trading of CBD common stock because of CBD's failure to lodge its 2014 Annual Report.

101. On November 14, 2014, CBD filed for voluntary administration in Australia. The voluntary administration process is regulated by the Australian Corporations Act 2001 in which an administrator is appointed to provide for the business, property, and affairs of an insolvent company to maximize the company's chances of continuing existence or to reach results that

would be more beneficial to the company's creditors rather than an immediate winding up of the company. CBD exited voluntary administration on January 27, 2015.

102. On November 25, 2014, the Company received a letter from NASDAQ's Listing Qualifications Department stating that, in light of the commencement of the voluntary administration, trading of the Company's common stock was to be suspended at the opening of business on Thursday, December 4, 2014 and that they would seek the delisting of the Company's shares. The Company appealed the delisting determination and appeared at a hearing before an independent NASDAQ Hearings Panel on January 8, 2015.

103. On December 2, 2014, CBD filed a Form 6-K with the SEC announcing PWC's resignation as CBD's auditor which went into effect on November 10, 2014.

104. On January 26, 2015, CBD received a letter from the NASDAQ Hearings Panel granting CBD's request to continue to list on NASDAQ subject to it meeting a series of deadlines including filing the annual report on Form 20-F for the year ending June 30, 2014 by April 30, 2015. CBD failed to meet this deadline and as a result, the stock remained halted.

105. On January 30, 2015, CBD's agreement with Westinghouse Electric Corporation ("Westinghouse") was terminated. CBD and Westinghouse entered into the agreement on October 21, 2013 granting CBD the exclusive, worldwide, long-term licensing agreement to use the WESTINGHOUSE® trademark as the corporate banner for its solar business.

106. On March 19, 2015, CBD announced that after a vote at a shareholders meeting, the Company would be changing its name to BlueNRGY Group Limited. The name was officially changed to BlueNRGY Group Limited on March 20, 2015.

107. On June 1, 2015, CBD filed the 2014 20-F with the SEC. The 2014 20-F included the 2012 and 2013 Restated Financial Statements and details ofthe related party transactions as detailed above.

108. On July 10, 2015, CBD filed the 2014 20-F/A with the SEC.

109. On July 22, 2015, NASDAQ filed a Form 25 with the SEC to begin the delisting process CBD common stock.

**THE UNDERWRITERS ARE LIABLE**

110. Section 11 of the Securities Act provides that underwriters are liable for any false statements of material facts or the omission to state a material fact in a registration statement. 15 U.S.C. § 77k(a)(5).

111. Section 12 of the Securities Act provides that any person who "offers or sells a security [...] by means of a prospectus or oral communication, which includes an untrue statement of a material fact" or omission of a material fact is liable. 15 U.S.C. § 77*l*(a)(2).

112. The Underwriter Defendants offered or sold CBD's securities. The Offering Documents indicated that CBD engaged National and Northland as underwriters to conduct the Offering.

113. It is commonly understood in the underwriting industry that the underwriter "prepare[s] disclosure and conduct[s] marketing" of the prospectus and registration statement.[2] Underwriters "assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering."[3]

---

[2]Goldman Sachs, Report of the Business Standards Committee, January 2011, at 13. Available at <http://www.goldmansachs.com/who-we-are/business-standards/committee-report/business-standards-committee-report-pdf.pdf> (last viewed August 13, 2015).

[3]*Id.*

114. As gatekeepers, underwriters must *independently* verify all material facts in offering documents. To conduct a proper due diligence, underwriters must take an *adverse* role to the issuer during the diligence process. In other words, underwriters are required to play "devil's advocate" to the issuer to ensure that the offering documents accurately reflect the financial and business condition of the issuer.

115. Both Section 11 and Section 12 provide that underwriters are liable for damages resulting from materially false misstatements contained in the offering documents.

116. The amount and nature of an issuer's debts and the issuer's total assets are all material facts requiring inquiry and independent verification by underwriters.

117. A proper due diligence here would have required the underwriter to, *inter alia*, inquire and independently verify transactions in which CBD was involved.

118. The Underwriter Defendants were negligent or willfully blind, in undertaking their duty to perform a reasonable due diligence investigation in acting as the underwriters for the June 2014 Offering of 1,810,000 shares of CBD common stock worth $7,240,000.

119. The Underwriter Defendants' due diligence investigation of CBD, if in fact any actual due diligence was performed, failed to uncover, among other things, that Defendant McGowan was engaged in related party transactions to the shareholders' detriment and the related party transactions were not reflected in the financial statements. Any reasonable due diligence investigation would have uncovered these very important facts.

120. As a result of the Underwriter Defendants not performing a reasonable due diligence investigation and/or not performing any due diligence investigation, the Offering Documents misrepresented material information and omitted material information so that the Offering Documents were misleading.

121. It is absolutely well understood in the investment banking industry and in the financial community generally, and confirmed in numerous court opinions, that an investment bank selling securities to investors has a duty to perform a reasonable due diligence investigation of the company for which it is selling securities to investors.

122. It is also well understood within the investment banking and financial communities that an investment bank's role and duty as an underwriter is to ensure that all material information is included in the offering documents (in this case the Offering Documents for the June 2014 financing for CBD) and that no material information is omitted that is needed to make the information provided therein not misleading.

123. In the area of selling securities to investors and performing a reasonable due diligence investigation, investment banks are often referred to as "gatekeepers." Underwriters control what information is in offering documents and it controls the dissemination of that information to potential investors. There is much literature that supports the premise of investment banks being gatekeepers. For example, investment bank, Goldman Sachs, published the *Report of the Business Standards Committee* dated January 2011, describing its role as an underwriter by stating: it "prepares the disclosure" in a prospectus, and will "conduct appropriate and thorough due diligence on the issuer" and will "endeavor to ensure there is no material misstatement/omission in the disclosure." Goldman Sachs also acknowledges its role as a gatekeeper stating: "An underwriter of financial instruments works with the issuer in connection with offering financial instruments to investors. In this context, the securities laws effectively impose a gatekeeper role on Goldman Sachs: as an underwriter firm is expected to assist the issuer in providing a Prospectus to investors that discloses all material information that is relevant to the offering." *Report of the Business Standards Committee* at 14.

124. The Offering of $7,240,000 of CBD common shares to investors was an underwriting. The CBD financing was an offering of securities to investors, for which the Underwriter Defendants sponsored the Offering, solicited the purchasers, distributed the Prospectus, and acted as an underwriter in the Offering. It was not a private placement.

125. The SEC has observed that in enacting Section 11 of the Securities Act, "Congress recognized that underwriters occupied a *unique position* that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability provisions [of the Act] would provide the necessary incentive to ensure their *careful investigation* of the offering." (emphasis added). Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998. In other words, underwriters, such as National and Northland, have ultimate control over the contents and dissemination of the disclosure document, i.e. the Offering Documents. Underwriters must make full disclosure or not underwrite the offering if full disclosure is not provided. The Underwriter Defendants had this role and duty in underwriting the common stock of CBD.

126. The above quoted statement by the SEC was also referred to the Honorable Denise Cote's important decision, *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628 (S.D.N.Y. 2004) - which in effect included a treatise on the history and importance of due diligence in selling securities to investors. Indeed, without an investment bank having performed a reasonable due diligence investigation of an issuer, it would not be possible to make full disclosure in the Offering Documents.

127. Because investment banks such as National and Northland have ultimate control over the contents and dissemination of the disclosure document, i.e., the Offering Documents, an investment bank must make full disclosure or not sponsor the financing if full disclosure is not to

be provided. If other participants in a financing refuse to provide or disclose important information, an investment bank should withdraw from the financing. When an investment bank allows its name to appear on the cover of a prospectus, it is communicating to potential investors that it is in fact satisfied, based on its reasonable due diligence investigation, that the prospectus being used for the stock offering is accurate and not misleading. This is a fundamental and basic expectation of investors - and investors rely on this expectation when purchasing securities. As the Judge Cote stated,"…, and if unsatisfied, they [the investment banks] must demand disclosure, withdraw from the underwriting process [the financing] or bear the risk of liability."*In re WorldCom*, 346 F. Supp. 2d at 684.

128. Although the term "due diligence" does not appear in any statute or rule, it is well accepted and understood in the investment banking and financial communities that a reasonable due diligence investigation refers to an affirmative duty to verify the accuracy of disclosure concerning securities offerings and that it is expected that a thorough investigation will take place as part of virtually every issuance of securities.

129. The due diligence process by an investment bank is generally rigorous and thorough, with professional skepticism to be applied. The due diligence process is not just a "ho-hum" exercise of accepting a company's/management's views or its auditors opinion at face value. The due diligence process is just the opposite. The investment bank should act as a "devil's advocate" by digging and probing within a company. The investment bank should cross examine participants by asking many questions; should obtain and analyze various information concerning all aspects of the issuer's business; and should follow-up with more work as appropriate depending upon what is learned and what "red flags" surface, if any.

130. As Professor Robert J. Haft, a Georgetown University Law Professor who has been actively engaged in the securities field for over forty years, states in his annually updated text, *Due Diligence Periodic Reports and Securities Offerings*: "The underwriter [investment bank] should look upon due diligence primarily as an attempt to find "red flags" which indicate potential danger. To assist in this search, the underwriter [investment bank] should not hesitate to incur reasonable costs to utilize experts [and attorneys] whenever it feels that neither the corporate finance department nor the firm at large has the expertise necessary to analyze a fundamentally important aspect of a company's business." (2004-2005 edition, at 13).

131. With respect to the importance of performing a reasonable due diligence investigation in regard to an issuer's financial condition, which investigation would clearly include such things as the appropriate checking for any undisclosed related party transactions involving the Company, it is accepted practice within the investment banking community that the statements by the issuer about its own financial condition are not accepted by the investment bank at face value without adequately questioning the company's auditors and its accounting and financial officers, as well as independently verifying information with third parties.

132. While the due diligence responsibility is not just that of investment banks, securities regulations and industry practice make it the primary responsibility of investment banks. To quote Judge Cote's opinion in *In re WorldCom,* "[N]o greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter … Underwriters function as 'the first line of defense' with respect to material misrepresentations." 346 F. Supp. 2d at 662. Also, as stated previously, the SEC has stated that: "Congress recognized that underwriters occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offering." *Id.* at 662.

133. The Underwriter Defendants did not conduct anything close to a reasonable due diligence investigation in regard to the Offering of CBD's common stock to investors in and around June 2014.

134. The Offering Documents failed to indicate that the Company was engaged undisclosed related party transactions which was detrimental to investors.

135. Any reasonable due diligence investigation by an investment bank should include extensive and thorough interviews with both a company's chief financial officer and its auditor - separately, and not together, or in addition to being together. All areas of concern that an auditor may have about the company and/or its accounting decisions should be discussed - with follow-up questioning if deemed necessary.

136. For the Underwriter Defendants to fail to question transactions between CBD and entities in which Defendant McGowan exercised influence and control is a due diligence failure of great magnitude.

137. The proof of how unreasonable or reckless the due diligence investigation of CBD was will be confirmed after discovery has been completed in this matter. Among other things, it will be confirmed whether or not the Underwriter Defendants have a detailed due diligence memorandum in its file, outlining precisely what it did in terms of due diligence. It is standard procedure in the investment banking industry to have a detailed due diligence memorandum in the files.

138. The Underwriters Defendants failed to conduct a proper due diligence. If they did, they would have discovered, among others, that: (1) Defendant McGowan was engaged in undisclosed related party transactions and (2) consequently the financial statements provided in the Offering Documents were materially false and misleading.

## THE AUDITORS ARE LIABLE

139. In the Offering Documents, the Auditor Defendants certified:

> ***We conducted our audit of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States).*** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. ***We believe that our audit provides a reasonable basis for our opinion."*** This certification was signed by the Auditor Defendants on December 20, 2013.
>
> (Emphasis added).

140. PWC consented to its audits being included in the Offering Documents as the Consent of Independent Registered Public Accounting Firm, signed by the Auditor Defendants, is attached as an exhibit to the Registration Statement.

141. An audit is not just a rubber stamp. Generally Accepted Auditing Standards ("GAAS") requires that "sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit." AU 326.01.The Auditor Defendants were required to base their reports on evidence obtained during the audit, not the conclusions of management. "Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements." AU § 326.02. "To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt or the auditor must express qualified opinion or a disclaimer of opinion." AU § 326.25.

142. While the Auditor Defendants may have had basic knowledge of CBD's business, they were negligent in obtaining the necessary understanding of CBD's financial controls. AU Section 311, entitled Planning and Supervision, states that "obtaining an understanding of the entity and its environment, including its internal control, is an essential part of planning and performing an audit in accordance with the generally accepted auditing standards." AU § 311.03. The PCAOB Auditing Standard No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, requires an auditor to "design his or her testing of controls to … obtain sufficient evidence to support the auditor's opinion on internal control over financial reporting." AS 5 ¶ 7.

143. In planning its audits of CBD, the Auditor Defendants were negligent in not obtaining sufficient knowledge to reveal CBD's undisclosed related party transactions.

144. Auditing Standard No. 15 ¶ 10 provides that "[w]hen using information produced by the company as audit evidence, the auditor should [...] [t]est the accuracy and completeness of this information." An auditor cannot take at face value, and blindly accept as truth, audit evidence proffered by the company. Instead, an auditor is required to exercise professional skepticism throughout the audit process.

145. Professional skepticism means that an audit be performed with "a questioning mind and a critical assessment of audit evidence." AU 230.07. Moreover, the auditor is mandated to conduct audits "with a mindset that recognizes the possibility that a material misstatement due to fraud could be present[.]" AU 316.13.

146. To comply with audit standards, the Auditor Defendants were required to obtain sufficient competent evidential matter relevant to the accuracy of the financial statements including examining any related party transactions. In meeting this standard, the Auditor

Defendants must make inquiries to the Company, followed by a letter of audit inquiry to the Company's outside counsel. AU 337.

147. AU 337.08 provides that "A letter of audit inquiry to the client's lawyer is the auditor's primary means of obtaining corroboration of the information furnished by management concerning litigation, claims, and assessments." Had the Auditor Defendants confirmed the Company's financial statement figures with third parties, they would have revealed the errors and improper transactions occurring and unaccounted for at CBD.

148. The Auditor Defendants were also required to confirm details of CBD's financial status, either through confirmation letters to third parties or via other adequate alternative procedure. AU 330. Had Auditor Defendants followed required audit procedures and confirmed with CBD's financial statements, it would have discovered the related party transactions.

149. Upon information and belief, the Auditor Defendants failed to obtain sufficient evidential matter to support their audit opinion regarding the financial statements. The Auditor Defendants' failure to comply with GAAP and GAAS was of the highest magnitude. Since Defendant McGowan was engaged in significant related party transactions, a competent audit would have uncovered evidence regarding these improper transactions.

150. The Auditor Defendants' failure to carry out standard audit procedures, and verify basic but crucial information, renders its audit as good as no audit at all.

151. Even though the Offering Documents only included audited financial statements through June 30, 2013, the Auditor Defendants were still required to inquire about material subsequent events, and to adjust/reissue their audit opinion if necessary. AU 560. During the period after PWC's last audit of CBD's financial statements but before the SEC declared CBD's Offering Documents effective, a series of adverse material subsequent events occurred, including

the Defendant McGowan siphoning money away from the Company. Had the Auditor Defendants done a proper audit, these subsequent events would not have been hidden from investors.

152. The Auditor Defendants neglected to follow audit procedures during its audits of CBD. Had they followed proper audit procedures, they would have discovered the related party transaction and the losses to Plaintiffs in the Offering and aftermarket would have been prevented.

**CLASS ACTION ALLEGATIONS**

153. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of common stock of CBD pursuant to and/or traceable to the Company's false and misleading Offering Documents issued in connection with the Offering and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

154. The members of the Class are so numerous that joinder of all members is impracticable. Over 1.8 million shares were sold during the Offering, which were then actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CBD or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

155. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

156. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

157. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

158. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Securities Act was violated by Defendants as alleged herein;

(b) whether statements made by Defendants misrepresented material facts about the business, operations, and management of CBD; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

159. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PROOF OF RELIANCE IS UNNECESSARY

160. Neither Plaintiffs nor the Class need prove reliance. Section 11(a) of the Securities Act specifically provides that Plaintiffs need not show reliance "if the issuer has not made available an earnings statement covering a period of at least twelve months beginning after the effective date of the registration statement." 15 U.S.C. §77k(a). In this case, shareholders could not rely on CBD's financial statements for the years ending June 30, 2012 and June 30, 2013.

161. Reliance is not an element of a claim arising under Section 12 of the Securities Act, 15 U.S.C. §77l. Therefore, Plaintiffs need not prove reliance as to their Section 12 claims.

162. Reliance is not an element of a claim arising under Section 15 of the Securities Act, 15 U.S.C. §77o. Therefore, Plaintiffs need not prove reliance as to their Section 12 claims.

## COUNT I
## Violation of Section 11 of the Securities Act
## Against All Defendants

163. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This claim is not based on and does not sound in fraud.

164. Plaintiffs purchased shares of CBD pursuant to CBD'sOffering Documents.

165. This claim is brought by Plaintiffs on their own behalf and on behalf of other members of the Class who acquired CBD shares pursuant to or traceable to the Company's Offering. Each Class Member acquired his, her, or its shares pursuant to and/or traceable to, and in reliance on, the Offering Documents. CBD is the issuer of the securities through the Offering Documents. The Individual Defendants are signatories of the Offering Documents.

166. Underwriter Defendants owed to the holders of the securities obtained through the Offering Documents the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such

statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein. As such, Defendants are liable to the Class.

167. The Auditor Defendants, CBD's certified public accountant at the time of the Offering, audited the financial statements contained in the Offering Documents, and issued a report included in the Offering Documents. The veracity of this report was based on the authority of the Auditor Defendants as experts in accounting and auditing.

168. The Auditor Defendants' report included in the Offering Documents was false because it stated that CBD's Financial Statements accurately represented the Company's operations and financial condition when in fact they did not.

169. The Auditor Defendants stated that its audits of CBD were conducted in accordance with PCAOB standards when in fact they were not.

170. All Defendants owed to the purchasers of the shares obtained through the Offering Documents the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

171. None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

172. Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, among other things, the facts set forth above. By reason of the conduct alleged herein, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

173. CBD is the issuer of the shares sold via the Offering Documents. As issuer of shares, the Company is strictly liable to Plaintiffs and the Class for the material misstatements and omissions therein.

174. At the times they obtained their shares of CBD, Plaintiffs and members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

175. This action is brought within one year after discovery of the untrue statements and omissions in and from the Offering Documents that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering Documents.

176. By virtue of the foregoing, Plaintiffs and all Class members are entitled to damages under Section 11 as measured by the provisions of the Section 11(e), from the defendants and each of them, jointly and severally.

**COUNT II**
**Violations of Section 12(a)(2) of the Securities Act**
**Against Underwriter Defendants**

177. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This claim is not based on and does not sound in fraud. This claim is asserted against the Underwriter Defendants.

178. Plaintiffs purchased CBD shares directly from the Underwriter Defendants in the Offering.

179. Underwriter Defendants were sellers, offerors and/or solicitors of sales of the shares offered pursuant to the Offering Documents. The Offering Documents contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.

180. Plaintiffs and the other Class members who purchased or otherwise acquired shares pursuant to the materially untrue and misleading Offering Documents did not know or, in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

181. This claim was brought within one year after the discovery of the untrue statements and omissions in the Offering Documents and within three years after CBD shares was sold to the Class in connection with the Offering.

182. The Underwriter Defendants owed to Plaintiffs and the other Class members who purchased or otherwise acquired shares pursuant to the materially false and misleading Offering Documents the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, to ensure such statements were true and that there was no omission of material fact necessary to prevent the statements contained therein from being misleading. The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading. By virtue of the conduct alleged herein, the Underwriter Defendants violated § 12(a)(2) of the Securities Act.

**COUNT III**
**Violations of Section 15 of the Securities Act**
**Against the Individual Defendants**

183. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This claim is not based on and does not sound in fraud.

184. This claim is asserted against the Individual Defendants, each of whom was a control person of CBD during the relevant time period.

185. The Individual Defendants were control persons of CBD by virtue of, among other things, their positions as senior officers and directors of the Company, and they were in positions to control and did control, the false and misleading statements and omissions contained in the Offering Documents.

186. None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

187. This claim was brought within one year after the discovery of the untrue statements and omissions in the Offering Documents and within three years after CBD shares was sold to the Class in connection with the Offering.

188. By reason of the misconduct alleged herein, for which CBD is primarily liable, as set forth above, the Individual Defendants are jointly and severally liable with and to the same extent as CBD pursuant to Section 15 of the Securities Act.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

(b) Entering a worldwide injunction freezing CBD's assets;

(c) Awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon; Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: August 13, 2015

Respectfully submitted,

/s/Yu Shi

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (*pro hac vice*)
Yu Shi, Esq. (*pro hac vice*)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: yshi@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*

**PAYNE MITCHELL LAW GROUP**
R. Dean Gresham, Esq. (State Bar No. 24027215)
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
Tel: (214) 252-1888
Fax: (214) 252-1889
Email: dean@paynemithcell.com

*Liaison Counsel for Lead Plaintiff and Class*

## CERTIFICATE OF SERVICE

I, Yu Shi, hereby declare under penalty of perjury as follows:

I am an attorney with the Rosen Law Firm, P.A. with offices at 275 Madison Avenue, 34th Floor, New York, NY 10016. I am over the age of eighteen. On August 13, 2015, I electronically filed the foregoing AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record. Service was also made via U.S. mail to CBD Energy Limited, by serving its process agent Corporation Service Company, 80 State Street, Albany, New York, 12207-2543.

Executed on August 13, 2015

/s/ Yu Shi