IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MAHMMOUD SAKHI, individually and on behalf of all others similarly situated, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 4:15-cv-1668 |
| BLUENRGY GROUP LIMITED, f/k/a CBD ENERGY LIMITED, ET AL., | ) | |
| Defendants. | ) | |

**MOTION TO DISMISS BY DEFENDANTS NATIONAL SECURITIES CORPORATION AND NORTHLAND SECURITIES, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

Paul R. Bessette
Texas Bar No. 02263050
S.D. Tex. Bar No. 22453

Michael J. Biles
Texas Bar No. 24008578
S.D. Tex. Bar No. 23146

James P. Sullivan
Texas Bar No. 24070702
S.D. Tex. Bar No. 1196607

Srimath S. Subasinghe
Texas Bar No. 24093226
S.D. Tex. Bar No. 2487169

KING & SPALDING LLP
401 Congress Avenue, Suite 3200
Austin, Texas 78701
pbessette@kslaw.com
[Tel.] (512) 457-2000
[Fax] (512) 457-2100

*Counsel for Defendants National Securities Corporation and Northland Securities, Inc.*

## TABLE OF CONTENTS

I. INTRODUCTION ... 1

II. BACKGROUND FACTS ... 1

III. ARGUMENT AND AUTHORITIES ... 5

A. Sakhi's Section 11 Claim Fails Because He Does Not Plausibly Allege That All Of His Ordinary Shares Are Traceable To The Registration Statement ... 6

B. Sakhi's Section 12(a)(2) Claim Fails Because He Does Not Plausibly Allege That National Or Northland Sold Ordinary Shares To Him ... 9

C. Sakhi Cannot Serve As The Lead Plaintiff For A Putative Class Of Which He Is Not A Member ... 11

D. Sakhi's Section 11 And Section 12(a)(2) Claims Fail Because National And Northland Reasonably Relied On PwC Australia's Audit ... 13

IV. CONCLUSION ... 17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... *passim*

*Bailey v. Patterson*, 369 U.S. 31 (1962) .......... 11

*Barnes v. Osofsky*, 373 F.2d 269 (2d Cir. 1967) .......... 8

*Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
No. 14-cv-786, 2015 WL 927456 (D. Minn. Mar. 4, 2015) .......... 8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... *passim*

*Brown v. Bilek*, 401 F. App'x 889 (5th Cir. 2010) .......... 13

*In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104 (9th Cir. 2013) .......... 7, 8

*In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580 (S.D.N.Y. 2005) .......... 9

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) .......... 14, 16

*In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804 (S.D. Tex. 2004) .......... 16

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) .......... 9

*Feiner v. SS&C Techs., Inc.*, 47 F. Supp. 2d 250 (D. Conn. 1999) .......... 10

*Feit v. Leasco Data Processing Equip. Corp.*,
332 F. Supp. 544 (E.D.N.Y. 1971) .......... 14

*Feyko v. Yuhe Int'l, Inc.*,
No. 11-cv-5511, 2013 WL 816409 (C.D. Cal. Mar. 5, 2013) .......... 15, 16

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
862 F. Supp. 2d 322 (S.D.N.Y. 2012) .......... 12

*Gines v. D.R. Horton, Inc.*, 699 F.3d 812 (5th Cir. 2012) .......... 1

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) .......... 9

*Johnson v. Am. Credit Co.*, 581 F.2d 526 (5th Cir. 1978) .......... 11

*Jones v. Louisiana*, 764 F.2d 1183 (5th Cir. 1985) .......... 12

*Krim v. PcOrder.com, Inc.*, 402 F.3d 489 (5th Cir. 2005) .......... 7, 8, 9

*Loa-Herrera v. Trominski*, 231 F.3d 984 (5th Cir. 2000) .......... 12

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
238 F.3d 363 (5th Cir. 2001) .......... 3

*Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717 (5th Cir. 2013) .......... 14

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) ........ 6

*Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*,
660 F.2d 9 (2d Cir. 1981) ........ 11

*In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128 (S.D.N.Y. 2007) ........ 12

*Ordonez v. Napolitano*, 598 F.3d 222 (5th Cir. 2010) ........ 11

*Ortiz v. Citimortgage, Inc.*, 954 F. Supp. 2d 581 (S.D. Tex. 2013) ........ 1

*Pedrina v. Chun*, 906 F. Supp. 1377 (D. Haw. 1995) ........ 12

*Pinter v. Dahl*, 486 U.S. 622 (1988) ........ 9, 10

*Richards v. Mitcheff*, 696 F.3d 635 (7th Cir. 2012) ........ 14

*Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003) ........ 6, 7, 9, 10

*Scott v. ZST Digital Networks, Inc.*,
896 F. Supp. 2d 877 (C.D. Cal. 2012) ........ 9

*In re Software Toolworks Inc.*, 50 F.3d 615 (9th Cir. 1994) ........ 14

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ........ 1

*In re Waste Mgmt., Inc. Sec. Litig.*,
128 F. Supp. 2d 401 (S.D. Tex. 2000) ........ 13

*Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014) ........ 10

*Z-Seven Fund, Inc. v. Motorcar Parts & Accessories*,
231 F.3d 1215 (9th Cir. 2000) ........ 12

**Statutes and Rules**

15 U.S.C. § 77k ........ *passim*

15 U.S.C. § 77*l* ........ *passim*

15 U.S.C. § 77*o* ........ 5

15 U.S.C. § 77z-1 ........ 4, 12

FED. R. CIV. P. 10 ........ 12

FED. R. CIV. P. 12 ........ 5, 14, 16, 17

**Other Authorities**

LOUIS LOSS & JOEL SELIGMAN,
FUNDAMENTALS OF SECURITIES REGULATION (5th ed. 2004) ........ 3

## I. INTRODUCTION

Lead plaintiff Mahmmoud Sakhi asserts claims against National Securities Corporation ("National") and Northland Securities, Inc. ("Northland") under Section 11 and Section 12(a)(2) of the Securities Act of 1933. The problem for Sakhi is that Section 11 and Section 12(a)(2) authorize recovery for a very narrow group of plaintiffs—a group to which he does not belong. Sakhi did not acquire his shares until almost two months after the offering in question had closed, when he made a series of aftermarket purchases to which National and Northland were not parties. His claims should be dismissed. Sakhi is not the right plaintiff to attack an offering in which he did not participate. And even if a proper plaintiff were to come out of the woodwork at this late date, all such claims would fail because National and Northland reasonably relied on accounting experts for the challenged portions of the offering documents.

## II. BACKGROUND FACTS[1]

CBD Energy Limited ("CBD") is an Australian corporation that has provided renewable energy since its founding in 1989. (AC ¶ 17.) Ordinary shares of CBD stock were listed on the Australian Stock Exchange from 1989 until January 31, 2014, when CBD voluntarily delisted in anticipation of trading in the United States.

---

[1] For purposes of this motion, factual allegations in Sakhi's amended complaint (Docket Entry No. 27 ("AC")) are taken as true, but legal conclusions couched as factual allegations are not. *See Ortiz v. Citimortgage, Inc.*, 954 F. Supp. 2d 581, 584 (S.D. Tex. 2013) (Miller, J.). The Court can consider the documents appended as exhibits to this motion because they are referenced by Sakhi's amended complaint and are central to his claims. *See Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 (5th Cir. 2012).

*See* Annual Report, Ex. 3, at 29. Ordinary shares of CBD stock then traded on the NASD's Over-the-Counter Bulletin Board from February 10, 2014 until June 13, 2014, *see id.*, with 2,071,304 ordinary shares outstanding as of May 19, 2014, *see* Prospectus, Ex. 2, at 116. On June 13, 2014, ordinary shares of CBD stock began trading on the NASDAQ under the ticker symbol "CBDE." *See* Annual Report, Ex. 3, at 29.[2]

In 2014, CBD sought to raise additional capital through a stock offering. To that end, CBD used Form F-1/A to file a Registration Statement on June 4, 2014 (AC ¶ 34), which the SEC declared effective on June 12, 2014 (AC ¶ 35). *See generally* Registration Statement, Ex. 1. CBD then filed a Prospectus with the SEC on June 16, 2014 (AC ¶ 36), offering 1,810,000 ordinary shares of CBD stock. *See generally* Prospectus, Ex. 2. These two filings, which will be collectively referred to as "the Offering Documents," contained CBD's audited financial statements for 2012 and 2013, along with CBD's unaudited December statements. (AC ¶ 4, 41.) The audit opinions reflected in the Offering Documents were provided by PricewaterhouseCoopers Australia ("PwC Australia") (AC ¶¶ 5, 31). *See also* Registration Statement, Ex. 1, at F-42, F-120; Prospectus, Ex. 2, at F-42, F-120.

CBD's offering of 1,810,000 ordinary shares pursuant to the Registration Statement and the Prospectus commenced on June 13, 2014 and closed on June 18, 2014. (AC ¶¶ 1, 37.) The June 2014 offering was made through a firm-commitment

---

[2] Sakhi's amended complaint uses the phrase "common stock" (*e.g.*, AC ¶ 14) to describe what CBD has consistently referred to as its "ordinary shares." *See, e.g.*, Prospectus, Ex. 2, at 7; Annual Report, Ex. 3, at 29.

underwriting,[3] *see* Prospectus, Ex. 2, at 129, with National and Northland serving as the underwriters and selling at $4 per share for total proceeds of $7,240,000 (AC ¶¶ 2–3, 38). National, the sole book-running manager, was allocated 1,448,000 ordinary shares to sell. (AC ¶ 27.) Northland, the co-manager, was allocated the remaining 362,000 ordinary shares to sell. (AC ¶ 28.)

Upon being sold in the June 2014 offering, the 1,810,000 ordinary shares of CBD stock "were then actively traded on the NASDAQ." (AC ¶ 154.) In addition, CBD discharged some debt on June 13, 2014 by exchanging ordinary shares of CBD stock for convertible notes held by its creditors. *See* Prospectus, Ex. 2, at 2–3, 12, 44, 72–74. For example, a $1,561,093 debt obligation to Sligo Investments Limited was extinguished in exchange for 390,273 ordinary shares of CBD stock. (AC ¶ 46.) The former noteholders were free to trade these newly acquired ordinary shares on the NASDAQ. *See* Prospectus, Ex. 2, at 120. By contrast, CBD and its officers and directors could not sell any of their ordinary shares until December 13, 2014, based on lock-up agreements they entered into with National and Northland. *See id.*

Within a few months of the June 2014 offering, PwC Australia uncovered alleged corporate malfeasance on the part of Gerard McGowan (AC ¶ 84), who served as the managing director of CBD and the chairman of its board of directors (AC ¶ 19). In that role, McGowan had engaged in self-dealing transactions with related parties, including Sligo Investments Limited. (AC ¶¶ 44, 46, 81–83.) But

---

[3] In a firm-commitment underwriting, the issuer sells its entire issue of shares to underwriters, who in turn sell the shares to dealers or the public. *See Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 369 (5th Cir. 2001); LOUIS LOSS & JOEL SELIGMAN, FUNDAMENTALS OF SECURITIES REGULATION 76 (5th ed. 2004).

CBD's audited financial statements for 2012 and 2013 did not account for McGowan's related-party transactions, which had been concealed from PwC Australia, and therefore failed to disclose his self-dealing to readers of the Offering Documents. (AC ¶¶ 45, 47–49, 67, 89–95.)

On October 24, 2014, after being informed by PwC Australia of McGowan's misconduct, CBD disclosed these problems to the market and urged non-reliance on its financial statements for 2012 and 2013. (AC ¶¶ 6–7, 43, 85–86.) The price of ordinary shares of CBD stock dropped more than 37% that day. (AC ¶ 97.) McGowan took a leave of absence from CBD and eventually resigned. (AC ¶¶ 19, 85, 99.) Meanwhile, CBD descended into the Australian equivalent of bankruptcy, called voluntary administration, on November 14, 2014, from which it emerged as a restructured company on January 27, 2015. (AC ¶ 101.) Trading on the NASDAQ of ordinary shares of CBD stock was halted on November 12, 2014, and a process of involuntary delisting began on July 22, 2015. (AC ¶¶ 17, 100, 102, 104, 109.)

Predictably, litigation ensued. Upon receipt of this case in a transfer from the Eastern District of Texas, this Court appointed Sakhi as the lead plaintiff under the Private Securities Litigation Reform Act (PSLRA). *See* 15 U.S.C. § 77z-1(a)(3). Seeking money damages on behalf of a putative class of all who purchased ordinary shares of CBD stock pursuant or traceable to the Offering Documents between June 13, 2014 and October 24, 2014, Sakhi filed an amended complaint in which he claimed, among other things, that National and Northland violated Section 11 and Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2). (AC

¶¶ 110–38, 153, 163–82.) Sakhi's amended complaint also purported to add Joseph Pankowski and Dmytro Kavchak as named plaintiffs. (AC ¶¶ 15–16.)[4]

According to Sakhi, the restatement of CBD's financial statements shows that the Offering Documents were false and misleading for having included them. (*E.g.*, AC ¶ 62.) He further alleges that McGowan's related-party transactions would have been "simple" for PwC Australia or the underwriters to uncover. (AC ¶ 96.) On this view, all of the defendants—including National and Northland—failed to make a reasonable and diligent investigation of the challenged statements in the Offering Documents. (*See, e.g.*, AC ¶¶ 114, 119, 133, 136.)

## III. ARGUMENT AND AUTHORITIES

This motion asks the Court to dismiss Sakhi's amended complaint for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Claims under sections 11 and 12(a)(2) are . . . Securities Act siblings with roughly parallel elements, notable both for the limitations on their scope as well as

[4] In addition to the claims against National and Northland, Sakhi's amended complaint accused CBD, its directors and officers, and PwC Australia of violating Section 11 and Section 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*o*. (AC ¶¶ 17–25, 30–31, 163–76, 183–88.)

the *in*[ ]*terrorem* nature of the liability they create." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

> To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

*Id.* at 358–59 (quoting 15 U.S.C. § 77k). Similarly,

> the elements of a prima facie claim under section 12(a)(2) are: (1) the defendant is a "statutory seller"; (2) the sale was effectuated "by means of a prospectus or oral communication"; and (3) the prospectus or oral communication "include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."

*Id.* at 359 (alterations in original) (quoting 15 U.S.C. § 77*l*(a)(2)). Sakhi flunks the plausibility standard of *Iqbal* and *Twombly* with his Section 11 and Section 12(a)(2) claims against National and Northland.

**A. Sakhi's Section 11 Claim Fails Because He Does Not Plausibly Allege That All Of His Ordinary Shares Are Traceable To The Registration Statement**

Section 11 narrows its own cause of action to "any person acquiring such security," 15 U.S.C. § 77k(a), thereby limiting the universe of proper plaintiffs to "anyone who can 'trace' his shares to the challenged registration statement," *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 873 (5th Cir. 2003). As a result, Sakhi's Section 11 claim must be dismissed unless he adequately alleges that all 36,100 of his ordinary shares of CBD stock (AC ¶ 14) were issued in June 2014 pursuant to

the challenged Registration Statement. *See Krim v. PcOrder.com, Inc.*, 402 F.3d 489, 494–502 (5th Cir. 2005). To satisfy the plausibility standard of *Iqbal* and *Twombly* on this point, Sakhi's amended complaint must go beyond conclusory allegations and provide factual specificity supporting a reasonable inference that his ordinary shares are traceable to the Registration Statement. *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107–08 (9th Cir. 2013).

But a conclusory allegation is all Sakhi can muster: "Lead Plaintiff Mahmmoud Sakhi . . . purchased 36,100 shares of CBD common stock pursuant to or traceable to CBD's Offering . . . ." (AC ¶ 14.) Absent from his amended complaint are factual allegations making this a plausible conclusion. For example, Sakhi does not allege that all ordinary shares of CBD stock were issued in a single public offering pursuant to a single registration statement, such that any share held by an investor would necessarily be traceable as a logical matter. *See Rosenzweig*, 332 F.3d at 873 ("[B]ecause there was only *one* offering of Azurix stock, all the plaintiffs' stock is traceable to the challenged registration statement.").

To the contrary, there were 2,071,304 ordinary shares outstanding just prior to the challenged June 2014 offering. *See* Prospectus, Ex. 2, at 116. Although some of those ordinary shares were subject to lock-up agreements, others were freely tradable before, during, and after the June 2014 offering. *See id.* at 120 ("[T]he ordinary shares held by our directors[] and executive officers will be subject to the lock-up agreements set forth above. *Other holders of our securities have not agreed to enter into such lock-up agreements and will be able to freely sell their ordinary*

*shares*." (emphasis added)). In addition, former noteholders like Sligo Investments Limited—which exchanged convertible notes for 390,273 ordinary shares of CBD stock (AC ¶ 46)—were at liberty to trade their ordinary shares on the NASDAQ as of June 13, 2014. *See* Prospectus, Ex. 2, at 120.

Sakhi cannot plausibly allege traceability in this situation. The 1,810,000 ordinary shares that issued under the Registration Statement in the June 2014 offering "were then actively traded on the NASDAQ" (AC ¶ 154), where they became intermingled with other ordinary shares of CBD stock that did not issue under the Registration Statement. Sakhi did not purchase his 36,100 ordinary shares until almost two months later, in August 2014. (AC ¶ 14; Docket Entry No. 12-5.) There are no factual allegations in Sakhi's amended complaint that plausibly show him to have performed the "often impossible" task of "trac[ing] the lineage of [his] shares to the new offering." *Barnes v. Osofsky*, 373 F.2d 269, 271–72 (2d Cir. 1967) (Friendly, J.); *see also Krim*, 402 F.3d at 498 (noting that "the fungible nature of stocks" makes tracing "virtually impossible"); *Century Aluminum*, 729 F.3d at 1106 (noting that tracing "is easier said than done").

The traceability boilerplate in Sakhi's amended complaint (AC ¶ 14) will not suffice under *Iqbal* and *Twombly*. *See Century Aluminum*, 729 F.3d at 1107–08 (affirming dismissal of complaint where plaintiffs "allege[d], without more, that they 'purchased Century Aluminum common stock directly traceable to the Company's Secondary Offering' "); *Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, No. 14-cv-786, 2015 WL 927456, at *15–*17 (D. Minn. Mar. 4, 2015)

(dismissing claim where plaintiffs "simply plead[ed] that the shares were purchased 'pursuant and/or traceable to' the misleading registration statement"); *Scott v. ZST Digital Networks, Inc.*, 896 F. Supp. 2d 877, 883 (C.D. Cal. 2012) (holding that "mere boilerplate allegations of traceability are insufficient"). Because Sakhi has failed to satisfy the tracing requirement, his Section 11 claim against National and Northland should be dismissed. *See Krim*, 402 F.3d at 491.

### B. Sakhi's Section 12(a)(2) Claim Fails Because He Does Not Plausibly Allege That National Or Northland Sold Ordinary Shares To Him

Liability under Section 12(a)(2) is similarly narrow because the statute provides, in relevant part, that "[a]ny person who . . . offers or sells a security . . . shall be liable . . . to the person purchasing such security from him." 15 U.S.C. § 77*l*(a)(2). This statutory text obliges Sakhi to plead that he purchased his ordinary shares of CBD stock (AC ¶ 14) from National or Northland in the June 2014 offering, rather than acquiring them in the aftermarket. *See, e.g.*, *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 529 F. Supp. 2d 644, 649 n.1 (S.D. Tex. 2006) (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 582 (1995)); *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 588–89 (S.D.N.Y. 2005). To do so, the amended complaint must adequately allege either that National or Northland "actually passed title to" Sakhi, or else that National or Northland " 'successfully solicited the purchase, motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner.' " *Rosenzweig*, 332 F.3d at 871 (quoting *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)).

Here, too, Sakhi fails to satisfy the plausibility standard of *Iqbal* and *Twombly*. The mere allegation that Sakhi "purchased 36,100 shares of CBD common stock pursuant to or traceable to CBD's Offering" (AC ¶ 14) is precisely the kind of conclusory statement that has been held to lack the requisite factual support. *See Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 899–901 (4th Cir. 2014) (holding that a complaint based solely upon " 'pursuant and/or traceable to' language" lacks "sufficient supporting facts" to "give rise to a plausible inference of standing" under Section 12(a)(2)).

Crucially, Sakhi does not allege that National or Northland passed title to him when he purchased 36,100 ordinary shares of CBD stock in August 2014—nearly two months after the June 2014 offering closed. (*See* AC ¶ 14; Docket Entry No. 12-5.) Nor does Sakhi allege that National or Northland directly communicated with him in an active effort to solicit his August 2014 purchases. *See Rosenzweig*, 332 F.3d at 871 ("To count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer."); *Feiner v. SS&C Techs., Inc.*, 47 F. Supp. 2d 250, 254 (D. Conn. 1999) ("[A] defendant's mere status as an underwriter is not sufficient to make it a seller to all purchasers for purposes of § 12(a)(2).").

Under Section 12(a)(2), "remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Pinter*, 486 U.S. at 644 n.21; *see also Rosenzweig*, 332 F.3d at 871 n.10 (holding that *Pinter*'s "analysis applies identically to § 12(a)(2)"). Because Sakhi does not plausibly allege that he is a "person purchasing such security from"

National or Northland within the meaning of the statute, 15 U.S.C. § 77*l*(a)(2), his Section 12(a)(2) claim against them should be dismissed.

### C. Sakhi Cannot Serve As The Lead Plaintiff For A Putative Class Of Which He Is Not A Member

The amended complaint seeks to bring Section 11 and Section 12(a)(2) claims on behalf of a class of "purchasers of common stock of CBD pursuant to and/or traceable to the Company's false and misleading Offering Documents issued in connection with the Offering." (AC ¶ 153.) But Sakhi is not even a member of that putative class, for the reasons set forth in Parts III.A and III.B, *supra*. Sakhi did not make traceable purchases from National or Northland—and thus cannot state a claim under either Section 11 or Section 12(a)(2)—because he acquired his 36,100 ordinary shares of CBD stock through aftermarket purchases almost two months after the June 2014 offering closed. (*See* AC ¶ 14; Docket Entry No. 12-5.)

Sakhi is therefore unfit to serve as the lead plaintiff in this putative class action. A representative party must be a member of the class he purports to represent. *See, e.g.*, *Bailey v. Patterson*, 369 U.S. 31, 32–33 (1962) (per curiam); *Ordonez v. Napolitano*, 598 F.3d 222, 227 (5th Cir. 2010) (Garwood, J.); *Johnson v. Am. Credit Co.*, 581 F.2d 526, 532 (5th Cir. 1978) (Wisdom, J.); *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 16–17 & n.6 (2d Cir. 1981) (Friendly, J.). Yet Sakhi does not plausibly allege that he purchased his ordinary shares in a way that would make him a proper plaintiff under Section 11 or Section 12(a)(2).

"It is . . . part of a lead plaintiff's responsibility to propose their own withdrawal and substitution should it be discovered that they may no longer

adequately represent the interests of the purported plaintiff class." *In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 134 (S.D.N.Y. 2007). In recognition of his duty in that regard, Sakhi should step down as the lead plaintiff in this case. The Court can then reopen the PSLRA process for appointing a lead plaintiff and lead counsel. *See* 15 U.S.C. § 77z-1(a)(3); *Z-Seven Fund, Inc. v. Motorcar Parts & Accessories*, 231 F.3d 1215, 1218–19 (9th Cir. 2000); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322, 326–28 (S.D.N.Y. 2012).

Perhaps realizing that their client is fatally flawed, Sakhi's counsel slipped two named plaintiffs into the amended complaint, called Pankowski and Kavchak, after this Court had already appointed Sakhi as the lead plaintiff under the PSLRA. (AC ¶¶ 15–16.) That was a questionable move. Sakhi's counsel did not seek the Court's leave to add named plaintiffs in the amended complaint. *See Pedrina v. Chun*, 906 F. Supp. 1377, 1397 (D. Haw. 1995) (dismissing claims of plaintiffs who were added in amended complaint without leave of court). Nor did the amended complaint comply with the requirement that "[t]he title of the complaint must name all the parties." FED. R. CIV. P. 10(a); *see also Jones v. Louisiana*, 764 F.2d 1183, 1185 (5th Cir. 1985) (holding that Rule 10(a) provides "the controlling principle as to who is a party to a complaint" by requiring "that all parties must be listed in the *caption* of the complaint"); *Loa-Herrera v. Trominski*, 231 F.3d 984, 991 (5th Cir. 2000) ("Failure to name a party [in accordance with Rule 10(a)] denies a court jurisdiction over that party.").

In any event, one of the named plaintiffs offers the same sort of conclusory statement that forecloses Sakhi's Section 11 and Section 12(a)(2) claims, alleging that "Named Plaintiff Dmytro Kavchak . . . purchased 5,000 shares of CBD common stock, issued pursuant to or traceable to CBD's Offering" in August 2014. (AC ¶ 16.) The other named plaintiff does go further, alleging that "Named Plaintiff Joseph Pankowski . . . purchased 1,500 shares of CBD common stock on June 13, 2014, issued pursuant to or traceable to CBD's Offering as he purchased directly from Defendant National." (AC ¶ 15.) But it is hard to see how Pankowski could serve as the lead plaintiff under the PSLRA, a role that would call upon him to supervise the attorneys working on behalf of the putative class. *See Brown v. Bilek*, 401 F. App'x 889, 893 (5th Cir. 2010). "[O]ne goal of the PSLRA is to have the plaintiff class, represented by a member with a substantial financial interest in the recovery as incentive, monitor the litigation to prevent its being 'lawyer-driven.' " *In re Waste Mgmt., Inc. Sec. Litig.*, 128 F. Supp. 2d 401, 411–12 (S.D. Tex. 2000). With no more than $6000 at stake, Pankowski has no such incentive to oversee the conduct of this litigation. *See* Certification, Docket Entry No. 27-1 (alleging that Pankowski bought 1500 ordinary shares of CBD stock at $4 per share).

### D. Sakhi's Section 11 And Section 12(a)(2) Claims Fail Because National And Northland Reasonably Relied On PwC Australia's Audit

No matter who is on the other side of the "v." in this case, National and Northland are not liable under Section 11 and Section 12(a)(2) because they reasonably relied on PwC Australia's audit of CBD's financial statements for 2012 and 2013. National and Northland are therefore entitled to the affirmative

defenses found in Section 11(b)(3)(C) and Section 12(a)(2).[5] The Court should dismiss all claims against National and Northland, for "[w]hen a successful affirmative defense appears on the face of the pleadings, dismissal under Rule 12(b)(6) may be appropriate." *Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 726 (5th Cir. 2013); *cf. Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012) (Easterbrook, J.) ("A plaintiff whose allegations show that there is an airtight defense has pleaded himself out of court, and the judge may dismiss the suit on the pleadings under Rule 12(c). This comes to the same thing as a dismissal under Rule 12(b)(6), and opinions . . . often use the two interchangeably.").

It is the job of an underwriter to "assume an opposing posture with respect to management" and "play devil's advocate" when reviewing the disclosures in a company's registration statement. *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 581–82 (E.D.N.Y. 1971). That said, "[a]n underwriter need not conduct due diligence into the 'expertised' parts of a prospectus, such as certified financial statements." *In re Software Toolworks Inc.*, 50 F.3d 615, 623 (9th Cir. 1994). "[U]nderwriters may reasonably rely on auditors' statements, absent red flags that the underwriters were in a position to see," *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1175 (C.D. Cal. 2008), and "courts look to *plaintiffs* to point to red flags that should have indicated to the underwriter that the

[5] *See* 15 U.S.C. § 77k(b)(3)(C) (relieving liability for a defendant who "sustain[s] the burden of proof . . . that . . . he had no reasonable ground to believe and did not believe" that an expertised portion of a registration statement was false or misleading); *id.* § 77*l*(a)(2) (relieving liability for a defendant who "sustain[s] the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission" in a prospectus).

financial statements were not trustworthy," *Feyko v. Yuhe Int'l, Inc.*, No. 11-cv-5511, 2013 WL 816409, at *8 (C.D. Cal. Mar. 5, 2013) (emphasis added).

The allegations in Sakhi's amended complaint explain why it was perfectly reasonable for National and Northland to rely on PwC Australia's audit with respect to the related-party transactions by McGowan that PwC Australia ultimately uncovered in the months after the June 2014 offering. PwC Australia brought to bear "the authority of . . . experts in accounting and auditing" (AC ¶ 167), and its audit was understood to be more than "just a rubber stamp" (AC ¶ 141). Moreover, PwC Australia certified that it had evaluated CBD in compliance with the applicable auditing standards. (AC ¶ 139.) According to the amended complaint, if PwC Australia had simply "followed required audit procedures and confirmed with CBD's financial statements, it would have discovered the related party transactions." (AC ¶ 148.) Even if catching McGowan really would have been a straightforward affair—a proposition that finds no factual support in the amended complaint—that would only bolster the position of National and Northland.

Given the allegations that McGowan's malfeasance was easy for an auditor to spot (*e.g.*, AC ¶¶ 96, 119, 138, 149), and that PwC Australia expressly claimed that task for itself (*e.g.*, AC ¶¶ 139, 152), it was reasonable for National and Northland not to chase someone else's fly ball. The amended complaint does not allege that National and Northland saw any red flags that would have called for second-guessing of PwC Australia's audit. Indeed, Sakhi implicitly concedes that he has no idea what the underwriters knew about the work of the auditors:

> The proof of how unreasonable or reckless the due diligence investigation of CBD was will be confirmed after discovery has been completed in this matter. Among other things, it will be confirmed whether or not the Underwriter Defendants have a detailed due diligence memorandum in its [sic] file, outlining precisely what it [sic] did in terms of due diligence.

(AC ¶ 137.)

"Affirmative defenses may support dismissal under Rule 12(b)(6) where facts alleged in plaintiffs' complaint clearly establish that the action is barred." *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 827 (S.D. Tex. 2004). As explained above, there are "allegations in the pleadings that establish [that the underwriters'] reliance [on PwC Australia's audit] was reasonable." *Id.* at 875. Because the affirmative defenses in Section 11(b)(3)(C) and Section 12(a)(2) thus appear on the face of the amended complaint, the Court should dismiss the claims against National and Northland. *See, e.g.*, *Countrywide*, 588 F. Supp. 2d at 1181–82 (dismissing claims on this ground); *Feyko*, 2013 WL 816409, at *8–*9 (same).

## IV. CONCLUSION

The Court should dismiss the amended complaint pursuant to Rule 12(b)(6).

Respectfully submitted.

s/ Paul R. Bessette

Paul R. Bessette
Texas Bar No. 02263050
S.D. Tex. Bar No. 22453

Michael J. Biles
Texas Bar No. 24008578
S.D. Tex. Bar No. 23146

James P. Sullivan
Texas Bar No. 24070702
S.D. Tex. Bar No. 1196607

Srimath S. Subasinghe
Texas Bar No. 24093226
S.D. Tex. Bar No. 2487169

KING & SPALDING LLP
401 Congress Avenue, Suite 3200
Austin, Texas 78701
pbessette@kslaw.com
[Tel.] (512) 457-2000
[Fax] (512) 457-2100

October 30, 2015

*Counsel for Defendants National Securities Corporation and Northland Securities, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on October 30, 2015, I electronically filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who have consented to electronic notification. I further certify that I mailed the foregoing motion and the notice of electronic filing by first-class mail to all non-CM/ECF participants.

s/ Paul R. Bessette
*Counsel for Defendants National Securities Corporation and Northland Securities, Inc.*