## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL JOHNSON, *on behalf of himself and others similarly situated*, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | CIVIL ACTION H-15-1668 |
| CBD ENERGY LIMITED, *et al.,* | § § § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court are three motions to dismiss plaintiffs' amended complaint filed by National Securities Corporation and Northland Securities (the "Underwriter Defendants") (Dkt. 45), Richard Pillinger (Dkt. 71), and PricewaterhouseCoopers Australia ("PwC Australia") (Dkt. 72). After considering the motions, responses, replies, oral arguments, and applicable law, the court is of the opinion that the Underwriter Defendants' motion should be GRANTED as to the claims asserted by plaintiffs Mahmmoud Sakhi and Dmytro Kavchak, and those claims should be DISMISSED WITH PREJUDICE. The motion should be DENIED as to the Underwriter Defendants' reasonable reliance argument and as to the claims asserted by Joseph Pankowski, and Pankowski should be GRANTED leave to substitute himself as the new lead plaintiff.[1] Additionally, Pillinger's motion should be DENIED and PwC Australia's motion should be GRANTED. Accordingly, Pankowski's section 11 claim against PwC Australia should be DISMISSED WITH PREJUDICE.

---

[1] Plaintiffs requested leave to add Pankowski as the new lead plaintiff in the event that "the Court were to find that Mr. Sakhi lacks standing." Dkt. 73 at 17 n.5.

# I. BACKGROUND

On August 13, 2015, lead plaintiff Mahmmoud Sakhi and named plaintiffs Joseph Pankowski and Dmytro Kavchak ("Plaintiffs") filed this class action lawsuit against twelve individuals and entities including the Underwriter Defendants, Richard Pillinger, and PwC Australia, asserting violations of the Securities Act of 1933. Dkt. 27. The class consists of all persons (other than defendants) who purchased common stock of CBD Energy Limited ("CBD") (now known as BlueNRGY Group Limited) during the period from June 13, 2014, to October 24, 2014 ("class period"), pursuant to the Company's Registration Statement and Prospectus issued in connection with the Company's public offering, which commenced on June 13, 2014. *Id.* at 2. Plaintiffs allege violations of section 11 of the Securities Act against all defendants, section 12(a)(2) violations against the Underwriter Defendants, and section 15 violations against all individual defendants including Pillinger. *Id.* at 28, 44.

CBD is an Australian corporation that provided renewable energy. *Id.* at 5. Defendant Pillinger was CBD's Chief Financial Officer ("CFO") at all relevant times. *Id.* at 6. Ordinary shares of CBD stock were listed on the Australian Stock Exchange from 1989 until January 31, 2014, when CBD voluntarily delisted in anticipation of trading in the United States. Dkt. 45 at 5. Ordinary shares of CBD stock were then traded on the over-the-counter bulletin board ("OTCBB") from February 10, 2014, until June 13, 2014, when ordinary shares of CBD stock began trading on the NASDAQ under the ticker symbol "CBDE." *Id.* at 6. CBD offered stock using a Form F-1A to file a registration statement on June 4, 2014, which the SEC declared effective on June 12, 2014. *Id.* CBD then filed a prospectus with the SEC on June 16, 2014, offering 1,810,000 ordinary shares of CBD stock. Dkt. 45, Ex. 2. These two filings (prospectus and registration statement) (collectively,

the "Offering Documents") contained CBD's audited financial statements for 2012 and 2013, along with CBD's unaudited December statements. Dkt. 45, Exs. 1, 2. The audit opinions were provided by PwC Australia. Dkt. 45 at 6. CBD's offering of the 1,810,000 shares pursuant to the Offering Documents commenced on June 13, 2014, and closed on June 18, 2014. *Id*. The offering was made through a "firm-commitment underwriting," where the issuer (CBD) sells its entire issue of shares to underwriters, who in turn sell the shares to dealers or to the public. *Id*. at 7. National and Northland served as the underwriters and purchased the stock at $4 per share for a total of $7,240,000. *Id*. National was allocated 1,448,000 ordinary shares to sell and Northland was allocated the remaining 362,000 ordinary shares to sell. *Id*. After being sold to the Underwriter Defendants, the 1.8 million shares were then actively traded on the NASDAQ. *Id*. According to the prospectus (attached to Plaintiffs' amended complaint), there were 2,071,304 ordinary shares outstanding just prior to the June 2014 public offering. *See* Dkt. 45, Ex. 2 at 124. The prospectus provides that 378,959 of these shares were subject to lock-up agreements whereby CBD's directors and officers agreed not to sell their shares until December 13, 2014. *Id*. at 128. Additionally, CBD discharged some of its debt on June 13, 2014, by exchanging ordinary shares of CBD stock for convertible notes held by its creditors. Dkt. 27 at 10. For example, a $1,561,093 debt obligation to Sligo Investments Limited was extinguished in exchange for 390,273 ordinary shares of CBD stock. *Id*. The former noteholders were free to trade these newly acquired ordinary shares on the NASDAQ. Dkt. 45, Ex. 2 at 128.

Within a few months of the June 2014 offering, PwC Australia uncovered alleged corporate malfeasance on the part of Gerard McGowan, who served as the managing director of CBD and chairman of the board of directors. Dkt. 27 at 3. In that role, McGowan had allegedly engaged in

self-dealing transactions with related parties such as Sligo Investments Limited.  *Id*.  On October 23, 2014, CBD's Audit Committee determined that CBD's previously issued audited financial statements for 2012 and 2013 should no longer be relied upon because they did not account for McGowan's self-dealing transactions.  *Id*.  On October 24, 2014, after being informed by PwC Australia of McGowan's misconduct, CBD disclosed these problems to the market and urged non-reliance on its 2012 and 2013 financial statements.  *Id*.  The price of ordinary shares of CBD dropped more than 37% that day.  *Id*.  CBD then went into the Australian equivalent of bankruptcy in November of 2014 and emerged as a restructured company on January 27, 2015.  Dkt. 45 at 8.

On June 29, 2015, this court appointed Sakhi as the lead plaintiff under the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Dkt. 22.  Accordingly, Sakhi filed an amended complaint on behalf of a putative class of all who purchased ordinary shares of CBD stock pursuant or traceable to the Offering Documents between June 13, 2014, and October 24, 2014.  Dkt. 27.  The amended complaint purports to add Joseph Pankowski and Dmytro Kavchak as named plaintiffs.  *Id*.  According to Sakhi, CBD's Offering Documents were false and misleading as the 2012 and 2013 financial statements did not properly account for the related material party transactions.  *Id*. at 11.  Sakhi alleges that McGowan's related-party transactions would have been simple for PwC Australia and/or the Underwriter Defendants to discover.  Dkt. 27 at 24, ¶ 96.  Therefore, Plaintiffs assert that Defendants failed to make a reasonable and diligent investigation of the challenged statements in the Offering Documents.  *Id*. at 29, 34 ¶¶ 114, 119, 133, 136.

The Underwriter Defendants, Pillinger, and PwC Australia have each filed a motion to dismiss Plaintiffs' amended complaint.  Dkts. 45, 71, 72.  On March 21, 2016, Plaintiffs filed a combined response in opposition to each of the motions (Dkt. 73), to which the Underwriter

Defendants, PwC Australia, and Pillinger filed reply briefs.  Dkts. 74, 76, 77.  On April 27, 2016, the court held a hearing on Defendants' motions to dismiss.

## II. LEGAL STANDARD

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009).  "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555.  As part of the *Twombly-Iqbal* analysis, the court proceeds in two steps.  First, the court separates legal conclusions from well-pled facts.  *Iqbal*, 556 U.S. at 678–79.  Second, the court reviews the well-pled factual allegations, assumes they are true, and then determines whether they "plausibly give rise to an entitlement to relief."  *Id*. at 679.

## III. THE UNDERWRITER DEFENDANTS' MOTION TO DISMISS

**A.      Claims Under Sections 11 and 12(a)(2) of the Securities Act**

"Claims under sections 11 and 12(a)(2) are . . . Securities Act siblings with roughly parallel elements, notable both for the limitations on their scope as well as the *in*[ ]*terrorem* nature of the liability they create."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010). To state a claim under section 11, the plaintiff must allege that:

(1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

*Id*. at 358–59 (quoting 15 U.S.C. § 77k).  Similarly,

the elements of a *prima facie* claim under section 12(a)(2) are: (1) the defendant is a "statutory seller"; (2) the sale was effectuated "by means of a prospectus or oral communication"; and (3) the prospectus or oral communication "include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."

*Id*. at 359 (alterations in original) (quoting 15 U.S.C. § 77l(a)(2)).  However, in order to prevail on a claim under section 12(a)(2), the plaintiff must prove that he or she purchased shares directly from the underwriter.

Plaintiffs assert claims against the Underwriter Defendants under section 11 and section 12(a)(2) of the Securities Act of 1933.  The Underwriter Defendants argue that Sakhi cannot serve as the lead plaintiff in this action because he has not adequately pled a claim under section 11 or section 12(a)(2).  Dkt. 45 at 2.  They assert that Sakhi's section 11 claim fails because he does not plausibly allege that all of his ordinary shares are traceable to the registration statement and that his section 12(a)(2) claim fails because he does not allege that National or Northland sold ordinary shares directly to him.  *Id*.  Additionally, they contend that Plaintiffs' claims fail because the Underwriter Defendants reasonably relied on PwC Australia's audit report.  *Id*. at 2.

## B.    Standing

Plaintiffs concede that Sakhi and Kavchak do not have standing to assert a claim under section 12(a)(2).  Dkt. 84 at 15 (transcript from oral hearing).  Therefore, Sakhi must demonstrate

6

that he has standing to assert his section 11 claim in order to serve as lead plaintiff in this case. The amended complaint alleges that "[l]ead Plaintiff Mahmmoud Sakhi . . . purchased 36,100 shares of CBD common stock pursuant to or traceable to CBD's Offering." Dkt. 27 at 4, ¶ 14. It also provides that "[n]amed Plaintiff Dmytro Kavchak . . . purchased 5,000 shares of CBD common stock, issued pursuant to or traceable to CBD's Offering." *Id.* at 5, ¶ 16. The Underwriter Defendants claim that this conclusory language is insufficient and that "[t]o satisfy the plausibility standard of *Iqbal* and *Twombly* on this point, Sakhi's amended complaint must go beyond conclusory allegations and provide factual specificity supporting a reasonable inference that his ordinary shares are traceable to the Registration Statement." Dkt. 45 at 11.

Sakhi asserts that the conclusory allegation that he purchased shares "pursuant to or traceable to the Offering Documents" is sufficient for purposes of pleading the traceability requirement. Dkt. 73 at 14. He cites to a few district court cases in the Fifth Circuit that have held that general allegations of traceability are sufficient to allege section 11 standing. *Id.* at 14–16 (citing, *e.g.*, *Ryan v. Flowserve*, 2007 WL 924019, at *2 (N.D. Tex. Mar. 26, 2007) ("Defendants explain that Plumbers & Pipefitters must be dismissed for lack of standing because the pension fund cannot show through tracing that the shares it sold at a loss are the same shares it purchased in an allegedly tainted Flowserve offering. The Court fully has considered Defendants' § 11 tracing argument and has concluded that it is truly an issue of proof of damages, not standing.") (citations omitted); *In re Paracelsus Corp.*, 6 F. Supp. 2d 626, 631–32 (S.D. Tex. 1998) (Werlein, J.) (finding general allegation that plaintiffs purchased shares "pursuant to the Company's Public Offering Prospectuses" is sufficient to withstand motion to dismiss under Rule 12(b)(6)). However, each of these cases pre-dates *Twombly* and *Iqbal*. *See generally Iqbal*, 556 U.S. 662 and *Twombly*, 550 U.S. 544. That

7

being said, there have been a few courts in other circuits that have found, post *Iqbal*, that plaintiffs adequately pled traceability by generally alleging that their shares were purchased pursuant to or traceable to challenged offering.  *See, e.g., In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 657–58 (D. Md. 2012) ("It may well be that [the plaintiff] will be unable to prove that he bought directly in the offering or that he can trace his shares to the offering. However, inasmuch as the allegations present a plausible claim, they are adequate.");  *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011) ("The pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement.");  *see also Northumberland Cnty. Ret. Sys. v. Kenworthy*, No. CIV-11-520-D, 2013 WL 5230000, at *6 (W. D. Okla. Sept. 16, 2013) ("Whether Lead Plaintiffs can prove those allegations is a matter that involves consideration of the merits of the claims rather than the sufficiency of the pleadings and should not normally be considered at this stage of the litigation.").

Since *Iqbal* was decided, the Fifth Circuit has not addressed what is required to plead traceability for section 11 claims.  However, as the Underwriter Defendants point out, the Second, Fourth, and Ninth Circuits have weighed in on the issue.  Dkt. 74 at 7.  They claim that each of these circuits have held that Sakhi's boilerplate language fails to satisfy the plausibility standard.  *Id*. (citing *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 141–42 (2d Cir. 2013);  *Yates v. Mun. Mortgage & Equity, LLC*, 744 F.3d 874, 899–901 (4th Cir. 2014);  *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107–08 (9th Cir. 2013)).  However, the Second and Fourth Circuit cases deal only with section 12(a)(2) claims.  *See Freidus*, 734 F.3d at 141 (upholding the district court's ruling that lead plaintiffs failed to plead statutory standing on their section 12(a)(2) claims because they

"alleged only that they bought securities 'issued pursuant or traceable to' the Offering Materials");
*see also Yates*, 744 F.3d 874 at 899–901 (holding that a complaint based solely upon "'pursuant and/or traceable to' language" lacks "sufficient supporting facts" to "give rise to a plausible inference of standing" under section 12(a)(2)).

The Ninth Circuit case, on the other hand, applies the tracing requirement to section 11 claims, holding that in cases where the company offers shares in multiple registration statements, "the conclusory allegation that plaintiffs 'purchased [defendant company's] stock directly traceable to the Company's Secondary Offering'" is insufficient to state a section 11 claim. *In re Century*, 729 F.3d at 1108.

In *Century*, the plaintiffs purchased shares in defendant's company at the end of January 2009, alleging that the shares they purchased were issued under a materially false and misleading prospectus supplement dated January 28, 2009. *Id*. at 1108. The defendant had issued the prospectus supplement in connection with a secondary offering of 24.5 million shares of the company's stock. *Id*. However, when the secondary offering commenced, more than 49 million shares of common stock were already in the market. *Id*. Because the plaintiffs conceded that they bought their shares in the aftermarket, the court held that the plaintiffs were required "to trace the chain of title for their shares back to the secondary offering, starting with their own purchases and ending with someone who bought directly in the secondary offering." *Id*. at 1106–07. The court noted that

> [t]he level of factual specificity needed to satisfy this pleading requirement will vary depending on the context. For example, alleging that the plaintiff's shares are "directly traceable" to the offering in question might well suffice, even without "further factual enhancement," when all of the company's shares were issued in a single offering under a single registration statement. In that context, alleging that the

plaintiff's shares are directly traceable to the offering in question states a claim that is plausible on its face.  No further factual enhancement is needed because by definition all of the company's shares will be directly traceable to the offering in question.

When a company has issued shares in multiple offerings under more than one registration statement, however, a greater level of factual specificity will be needed before a court can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering.  Making this determination is context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Id.* at 1107.

Because aftermarket purchasers usually will not be able to trace their shares back to a particular offering when a company offers shares in multiple registration statements, the court held that conclusory allegations that the plaintiff purchased shares "directly traceable to the Company's Secondary Offering' does not allow [the court] to draw a reasonable inference about anything because it is devoid of factual content." *Id.* at 1107–08.  Moreover, the plaintiffs in *Century* claimed that they provided further factual specificity by pointing to allegations regarding the dates on which they purchased their shares, which coincided with a sharp spike in trading volume because the underwriters of the secondary offering "began flooding the market with Century Aluminum common stock that they had purchased in the Secondary Offering." *Id.* at 1108.  The court held that these additional allegations were still insufficient, reasoning that "plaintiffs' explanation is merely possible rather than plausible.  To render their explanation plausible, plaintiffs must do more than allege facts that are merely consistent with both their explanation and defendants' competing explanation." *Id.*

Plaintiffs urge this court to reject the holding in *In re Century.*  Dkt. 73 at 16;  Dkt. 78 at 16 (transcript from oral hearing).  Plaintiffs rely on *In re Ariad Pharm., Inc. Sec. Litig.*, 98 F. Supp. 3d 147, 169 (D. Mass. 2015), where the district court of Massachusetts rejected the Ninth Circuit's

holding, finding that "general allegations that the Plaintiffs hold traceable shares are sufficient to plead standing under Section 11." In so ruling, the court inexplicably dismissed *Century* as an outlier case and decided to "take[] a conservative approach" by applying the "established pre-*Twombly* standard." *Id.* The court finds this case unpersuasive and agrees with the *Century* court's context-specific approach to determining whether a plaintiff has adequately pled traceability. 729 F.3d at 1107. Given the Fifth Circuit's strict interpretation of the tracing requirement as it applies to aftermarket purchasers seeking standing under section 11, it seems far more likely that this Circuit would follow the Ninth Circuit's approach. *See Krim v. PcOrder.com, Inc*, 402 F.3d 489 at 495–96 (5th Cir. 2005) (noting that aftermarket purchasers seeking standing under section 11 "must demonstrate the ability to trace their shares to the faulty registration" and acknowledging that "market realities" and "the fungibility of stock . . . may render Section 11 ineffective as a practical matter in some aftermarket scenarios").

Sakhi purportedly purchased CBD shares on various dates in August 2014. *See* Dkt. 12, Ex. 5 at 2 (Sakhi Certification). The Underwriters contend that Sakhi cannot plausibly allege traceability in this situation because "[t]he 1,810,000 ordinary shares that issued under the Registration Statement in the June 2014 offering were then actively traded on the NASDAQ where they became intermingled with other ordinary shares that did not issue under the Registration Statement." Dkt. 45 at 12. They contend that there are no factual allegations in Sakhi's amended complaint that plausibly show him to have performed the "often impossible" task of "trac[ing] the lineage of [his] shares to the new offering." *Id.* (citing *Barnes v. Osofsky*, 373 F.2d 269, 271–72 (2d Cir. 1967)).

11

Plaintiffs attempt to invoke the "single offering" exception mentioned in *Century,* alleging that Sakhi need not trace his shares in this instance because CBD had "a single public offering pursuant to a single registration."  Dkt. 73 at 15.  Indeed, the Fifth Circuit has recognized this exception to the tracing requirement.  *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 873 (5th Cir. 2003) (finding the district court erred in concluding that the plaintiffs did not have standing on the mere fact that they were aftermarket purchasers, reasoning that "because there was only one offering of [defendant's] stock, all the plaintiffs' stock is traceable to the challenged registration statement"). However, Plaintiffs did not plead the "single offering" theory in their amended complaint.  Dkt. 27. Even if they had pled this theory, it would not be sufficient to satisfy the plausibility standard because, like in *Century*, the challenged offering was not the sole source of outstanding shares. Sakhi's amended complaint (and its incorporated documents) show that there were already millions of shares outstanding when additional shares were issued under the challenged offering.  According to the prospectus, there were 2,071,304 ordinary shares outstanding just prior to the challenged June 2014 offering.  *See* Dkt. 45, Ex. 2 at 124.  Moreover, the prospectus provides that only 378,959 of these ordinary shares were subject to lock-up agreements.  *Id*. at 128 (stating that CBD's executives and officers, who would hold an aggregate of 378,959 ordinary shares upon the completion of the June 2014 offering, would be subject to 180-day Lock-up Agreements).  There were also an additional 836,828 ordinary shares issued to note holders and directors, which became effective upon the commencement of trading on the NASDAQ Capital Market on the day of the challenged offering.  *Id*. at 12.  Therefore, based on the court's calculation, Sakhi purchased 31,000 shares from a pool of 4,339,173 ordinary shares available on the market in August of 2014, consisting of three groups: the (i) the 1,810,000 ordinary shares issued pursuant to the challenged offering, (ii) the

12

1,692,345 previously issued shares[2] not subject to lock-up agreements, and (iii) the 836,828 ordinary shares issued to note holders and directors. The aftermarket intermingling of these three groups of shares is the reason that Sakhi cannot rely on the boilerplate language included in the amended complaint to plausibly allege traceability. Dkt. 74 at 11.

Sakhi and Kavchak have not requested leave to amend in the event that the court finds that they lack standing. Even if the court were to grant leave, Sakhi and Kavchak do not appear to have any hope of curing their standing issues. The only other theory that this court is aware of that would allow a plaintiff to proceed on his or her section 11 claim without further factual allegations, is the "statistical theory" of section 11 standing. In *In re Ubiquiti Networks*, the Northern District of California distinguished *Century Aluminum* and found that there was no need for any further factual enhancement based on the plaintiff's statistical theory of establishing standing under section 11:

> Even assuming defendants are correct about the number of unrestricted shares available at the time plaintiffs purchased their shares, plaintiffs' theory of standing is straightforward, eminently plausible, and, indeed, highly likely. Defendants' alternate explanation—that plaintiffs chanced to purchase some of the 26,000 unrestricted shares buried in a haystack of over 87 million—is plausible, but not as plausible as plaintiffs' explanation. This case is not like *Century Aluminum*, where some 46 million shares were already available on the public market at the time plaintiffs bought in a secondary offering of 24.5 million shares.

*In re Ubiquiti Networks, Inc. Sec. Litig.*, 33 F. Supp. 3d 1107, 1119 (N.D. Cal. 2014) (citations omitted).

Sakhi has not alleged this "statistical tracing" theory of standing. However, even if the court were to grant Sakhi an opportunity to amend, the Fifth Circuit has rejected the theory that a plaintiff

---

[2]At the time of the June 2014 offering, there were 2,071,304 shares outstanding. As a result of the offering, 378,959 of those outstanding shares were subject to lock up agreements, leaving 1,692,345 pre-June 2014 Offering shares that Plaintiffs could have purchased.

can "demonstrate standing by showing a very high probability that they have at least one [share from the public offering]," finding that it "would impermissibly expand the statute's standing requirement." *Krim,* 402 F.3d at 496.  Moreover, in *Krim*, the odds were far greater that any share, chosen at random, would be one that was issued from the challenged offering.  *Id*. (finding that "any share of [defendant company's] stock chosen at random ha[d] at least a 90% chance of being tainted," compared to about a 40% chance in this case).  Therefore, Sakhi and Kavchak do not have statutory standing to assert claims under either section 11 or section 12 of the Securities Act. Accordingly, the claims asserted by Sakhi and Kavchak are DISMISSED WITH PREJUDICE.

**C.    Substituting Pankowski as New Lead Plaintiff**

In the alternative, Plantiffs request leave to add Pankowski as the new lead plaintiff.  Dkt. 73 at 17 n.5 (stating that "[i]f the Court were to find that Mr. Sakhi lacks standing, named plaintiffs would move to substitute in as lead plaintiffs").  It is undisputed that Pankowski has adequately alleged traceability by alleging that he "purchased 1,500 shares of CBD common stock on June 13, 2014  . . . directly from Defendant National."  Dkt. 27 at 4, ¶15.  However, the parties dispute whether it would be appropriate to substitute Pankowski in place of the now dismissed lead plaintiff without reopening the lead plaintiff selection process.

Plaintiffs cite the *Impax* case for the proposition that there is no need to reopen the lead plaintiff process when there is a named plaintiff who has standing.  *Id*. (citing *In re Impax Labs., Inc. Sec. Litig.*, 2008 WL 1766943, at *8 (N.D. Cal. Apr. 17, 2008) (holding that "the need to add representative plaintiffs may arise after a case has been initiated.  It would turn securities litigation into a game of snakes and ladders to hold that any time a new plaintiff is added, the action must 'go back to square one' and recommence the PSLRA lead plaintiff selection process. Relatedly, there

is no indication that Congress intended such repetitive preliminaries to securities litigation. The PSLRA's lead plaintiff provision is designed only to get cases off on the right foot.") (citations omitted)).

The Underwriter Defendants have not cited to any case law holding that it would be improper to substitute Pankowski as lead plaintiff.  However, they do point out that this court must determine whether Pankowski's $6,000 interest is sufficient to satisfy the typicality and adequacy requirements of Fed. R. Civ. P. 23.  Indeed, they suggest that Pankowski lacks "a substantial financial interest in the recovery as incentive [to] monitor the litigation to prevent its being 'lawyer-driven.'"  Dkt. 74 at 9 (quoting *In re Waste Mgmt., Inc. Sec. Litig.*, 128 F. Supp. 2d 401, 411–12 (S.D. Tex. 2000) (Harmon, J.)).

Based on the size of this case, where the challenged offering involves 1,810,000 shares sold at approximately $4 per share for a total of $7,240,000, the court finds that Pankowski's $6,000 interest makes him an adequate representative.  *See In re Nature's Sunshine Prod.'s Inc. Sec. Litig.*, 251 F.R.D. 656 at 661 (D. Utah 2008) (finding that a plaintiff's $1000 interest made him an adequate class representative and "join[ing] with other courts and 'reject[ing] defendants' suggestion that the relatively insubstantial value of plaintiff's claim may  pre[vent] him from adequately representing the class'").  Therefore, Pankowski's request for leave to amend the complaint and be substituted in as lead plaintiff is GRANTED.

**D.    The Underwriter Defendants' Reasonable Reliance Defense**

The Underwriter Defendants assert that they are not liable to any named plaintiff because they reasonably relied on PwC Australia's audit of CBD's financial statements for 2012 and 2013 and are therefore entitled to affirmative defenses under section 11(b)(3)(C) and Section 12(a)(2).

Dkt. 45 at 17–18.  This district has held that the "reliance on expert" affirmative defense is generally

reserved for summary judgment or trial:

> Although the reasonableness of a defendant's investigation or reasonable ground for his belief in and reliance on an expertised financial statement or expert report is usually a question for the jury, it may become a question of law on summary judgment where "only one conclusion about the conduct's reasonableness is possible," in other words, where "undisputed facts leave no room for a reasonable difference of opinion" and "no rational jury could conclude that the defendant had not acted reasonably."  *In re Software*, 50 F.3d at 621–22, *citing TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450 & n. 12, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Nevertheless, reasonableness in this context is "not a question properly resolved on a motion to dismiss."  *Griffin v. PaineWebber Inc.*, 84 F.Supp.2d 508, 513 (S.D.N.Y. 2000).  *See also Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 369 (5th Cir. 2001) (Due diligence in response to a § 11 claim "is an affirmative defense that must be pleaded and proved.");  *In re Cendant Litig.*, 60 F.Supp.2d 354, 365 (D.N.J.1999) (inappropriate to dismiss claims based on affirmative defense before summary judgment stage because contents of documentary evidence cannot be considered for truth of content beforehand); *In re International Rectifier Sec. Litig.*, No. CV91-3357-RMT(BQRX), 1997 WL 529600, *7 (C.D.Cal. Mar.31, 1997)("To the extent that the underlying facts are undisputed, the adequacy of the diligence may be appropriately decided on summary judgment.").

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 597 (S.D. Tex. 2003)

(Harmon, J.).

This case is not one of the rare cases where this affirmative defense appears clearly on the

face of the pleading.  Indeed, the amended complaint includes an entire section on the Underwriter

Defendants' liability and outlines in detail how they failed to perform their duties.  Dkt. 27 at 28–34,

¶¶ 110–139.  For example, Plaintiffs allege that they failed to uncover that "Defendant McGowan

was engaged in related party transactions to the shareholders' detriment" and suggest that these

related party transactions should have been discovered by conducting "thorough interviews with both

[CBD's] chief financial officer and its auditor [Defendant PwC Australia]."  *Id*. at 29, 34 ¶¶ 119,

135.  Accordingly, at this time, the court is not persuaded that these claims should be dismissed

based on the Underwriter Defendants' reasonable reliance argument.  Therefore, the Underwriter Defendants' motion to dismiss based on reasonable reliance is DENIED.

### IV. PILLINGER'S MOTION TO DISMISS

In addition to the Underwriter Defendants' standing argument, Pillinger, CBD's CFO, asserts that he should be dismissed from this lawsuit due to Plaintiffs' delay in serving him.  Dkt. 71 at 10. Rule 4(m) of the Federal Rules of Civil Procedure normally requires plaintiffs to serve process on defendants within 120 days of filing the complaint.  Fed. R. Civ. P. 4(m).  In this case, however, the 120-day rule in 4(m) does not apply because Pillinger is a foreign defendant residing in Australia. Rather, the Fifth Circuit has adopted a "flexible due diligence" standard for determining the timeliness of foreign service of process.  *Lozano v. Bosdet*, 693 F.3d 485, 490 (5th Cir. 2012).

In cases where dismissal for failure to serve process would result in dismissal with prejudice, the Fifth Circuit requires that the defendant show "a clear record of delay or contumacious conduct by the plaintiff."  *Id*. at 490.  The Fifth Circuit "generally only affirm[s] [a district court's dismissal with prejudice] when the delay: (1) was caused by the plaintiff himself, as opposed to by counsel; (2) resulted in actual prejudice to the defendants; or (3) was caused by intentional conduct."  *Id*. (citing *Milan v. USAA Gen Indem. Co.,* 546 F.3d 321, 326 (5th Cir. 2008) ).  None of these factors is present in this case.

Pillinger asserts that there is a clear record of delay in this case caused solely by Plaintiffs' inaction and lack of diligence.  Dkt. 71 at 5.  Pillinger does not appear to argue that the delay was caused by Plaintiffs themselves, as opposed to Plaintiffs' counsel, or that it was caused by intentional conduct.  Rather, Pillinger's arguments amount to attacks on *counsel's* failure to exercise diligence in serving Pillinger.  *Id*. at 14.  Pillinger complains that Plaintiffs' counsel waited 194 days to even

17

attempt service and then failed to effectuate service until over a year after the suit was filed. *Id*. On May 6, 2015, counsel initiated service of process on Pillinger pursuant to the Hague Convention. Dkt. 24 at 2. At this time, Sakhi had not even been appointed as lead plaintiff. Dkt. 22. Therefore, it is hard to imagine how Sakhi could be deemed at fault for the delay in attempting service. Approximately one month prior to the date that counsel attempted service, CBD's office address had moved. Dkt. 71 at 15. Consequently, counsel used the wrong address for serving Pillinger, causing further delay. *Id*. Pillinger asserts that if Plaintiffs exercised reasonable due diligence, they would have discovered the change in address and sent the summons and complaint to the proper address. *Id*.

Pillinger relies heavily on *Gartin*, where the Fifth Circuit affirmed the district court's dismissal with prejudice, finding that "a seven-month period of what can only be characterized as total inactivity" constitutes a "clear record of delay." *Gartin v. Par Pharm. Cos., Inc.*, 289 Fed. App'x 688, 694 (5th Cir. 2008) (noting that "this [was] a close case on the district court's exercise of discretion"). However, the present case is easily distinguishable from *Gartin,* a case that (1) did not involve a foreign defendant, so the strict 120-day deadline in Rule 4(m) applied, and (2) the plaintiffs ignored the court's *sua sponte* warning that they faced an impending dismissal upon failure to effect timely service. *Id*. at 694–95.

Moreover, Pillinger has not suffered any prejudice. The facts in this case establish that Pillinger has had actual knowledge of this lawsuit from its inception. As CBD's CFO, it is reasonable to assume that Pillinger was aware that CBD had been sued and that he was one of the defendants in the lawsuit. Indeed, at the hearing, Pillinger's counsel acknowledged that Pillinger has been aware of the lawsuit. Dkt. 84 at 48 ("[W]e have never argued in any of our briefing that our

client did not know about the lawsuit."). Pillinger claims he was prejudiced by the delay because he missed the opportunity to weigh in on two competing motions for appointment as lead plaintiff and lead counsel and the parties' agreed upon motion to transfer the case from the eastern district of Texas to this district. Dkt. 71 at 16. However, at the oral hearing it was revealed that Pillinger's counsel had notice of these motions and even made revisions to the agreed motion to transfer venue. Dkt. 84 at 48. Regardless, with respect to aliens such as Pillinger, venue is proper everywhere, so Pillinger had no basis to contest the parties' joint motion to transfer venue. Nor does Pillinger have standing to contest any of the lead plaintiff's motions. *See, e.g. In re Landry's Seafood Rest.*, 2000 WL 33999467, at *1 (S.D. Tex. March. 30, 2000) (Harmon, J.) (holding that pursuant to the express language of the PSLRA, defendants lack standing to challenge the selection of proposed lead plaintiffs). Accordingly, Pillinger has failed to establish that he suffered prejudice. Based on the above considerations, the court finds that dismissing Pillinger with prejudice is not in the interest of justice. Therefore, Pillinger's motion to dismiss is DENIED.

## V. PwC AUSTRALIA'S MOTION TO DISMISS

### A.    Plaintiffs' Section 11 Claim Against PwC Australia

Plaintiffs assert a claim against PwC Australia under section 11 of the Securities Act, based on PwC Australia's audit opinion contained in the Registration Statement for the June 2014 offering. Dkt. 27 at 41, ¶¶ 167–69.

PwC Australia asserts that Plaintiffs' claim fails in light of *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318, 1327 (2015), where the Supreme Court clarified the legal standard that should be applied to statements of opinion for section 11 claims. In *Omnicare*, the plaintiff brought a section 11 claim against the corporation and its

19

officers and directors, alleging that the defendants made material misstatements in a registration statement in connection with a public offering. *Id*. at 1323. In its discussion, the Court contemplated three types of statements potentially giving rise to section 11 liability: (1) statements of fact, (2) statements of pure opinion, and (3) statements of opinion containing embedded statements of fact. *Id*. at 1327–29. The Supreme Court held that "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless [of] whether an investor can ultimately prove the belief wrong." *Id*. at 1327. Statements of pure opinion are only false if the speaker did not sincerely hold such opinion at the time of the statement. *Id*. In *Omnicare*, the alleged misstatements were the following two sentences contained in the registration statement: "We believe our contract arrangements . . . are in compliance with applicable federal and state laws" and "[w]e believe that our contracts . . . bring value to the healthcare system and the patients we serve." *Id*. The Court concluded that both sentences were "pure statements of opinion," reasoning that the words "we believe" indicate that the company is expressing a "view, not a certainty." *Id*. Because the plaintiffs in *Omnicare* did not allege that the defendants did not subjectively believe either of these opinions, the Court held that neither of them constituted "untrue statements of material fact" under section 11. *Id*. at 1326–28.

PwC Australia asserts that Plaintiffs' section 11 claim fails as a matter of law because the statements it made are pure opinions and Plaintiffs do not allege that PwC Australia did not sincerely hold those opinions at the time of the Offering. Dkt. 72 at 5. In the amended complaint, Plaintiffs contend that PwC Australia's audit report was false in two respects: it stated (1) "CBD's Financial Statements accurately represented the Company's operations and financial condition when in fact they did not" and that (2) "its audits of CBD were conducted in accordance with PCAOB standards

20

when in fact they were not." Dkt. 27 at 41, ¶¶ 168–69.  PwC Australia argues that its use of the words "[i]n our opinion" and "we believe" make it clear that it is expressing a "view, not a certainty." Dkt. 72 at 12.  Specifically, the challenged statements made by PwC Australia in its audit report are:

> **In our opinion**, the accompanying consolidated statement of financial position and the related consolidated statement of comprehensive income, of changes in equity and of cash flows present fairly, in all material respects, the financial position of CBD Energy Limited and its subsidiaries at June 30, 2013.
>
> We conducted our audit of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. **We believe** that our audit provides a reasonable basis for **our opinion**.

Dkt. 72, Ex. 5 at 41 (emphasis added).

Based on the logic employed in *Omnicare*, PwC's statement regarding CBD's financial position is a pure statement of opinion.  The second statement—that PwC Australia's conducted the audit in accordance with PCAOB standards—also appears to be an opinion.  Courts have held that an auditor's "statement regarding [Generally Accepted Accounting Standards] compliance inherently [is] one of opinion" and therefore plaintiff must allege facts that, if true, would permit a conclusion that the auditor "either did not in fact hold that opinion or knew that it had no reasonable basis for it." *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 302 (S.D.N.Y. 2011); *see also Se. Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 1:12-CV-00993, 2015 WL 3833849, at *34 (M.D. Pa. June 22, 2015) (holding that defendant's "representation that its audit reports were

presented in conformity with GAAP" was an opinion statement); *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 413 (S.D.N.Y. 2013).

Therefore, PwC Australia urges the court to evaluate each of these statements under *Omnicare*'s legal standard for statements of opinion. Plaintiffs respond by arguing that (1) the *Omnicare* "pure statement of opinion" rule does not apply to an auditor's certification; and (2) even if it does apply, the audit report contains embedded statements of facts that are untrue. The court will address each of these arguments in turn.

## B.    Auditor Certification Exception to *Omnicare*

Plaintiffs claim that there is an "auditor" exception to the *Omnicare* rule and that "PwC Australia conflates the issues by focusing on the truth of its audit report, as opposed to CBD's underlying false financial statements." Dkt. 73 at 25. Accordingly, Plaintiffs claim that the statements at issue in this case are CBD's financial statements and that "[i]f any portion of those financial statements contain false statements . . . PwC Australia is strictly liable for them." *Id*. at 23.

In *Omnicare,* the Supreme Court outlines three exceptions to the "pure statement of opinion" rule. Importantly, the Court makes no mention of an "auditor certification" exception. To support their position, Plaintiffs cite to the following language in section 11:

> In case any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . may . . . sue . . . every accountant . . . who has with his consent been named as having . . . certified any part of the registration statement . . . , with respect to the statement in such registration statement . . ., which purports to have been . . . certified by him.

15 U.S.C. § 77k (a)(4).

They also cite to the *WorldCom* decision, where a district court held that "an accountant has responsibility under Section 11 for the accuracy of the financial statements she certifies."   *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 492 (S.D.N.Y. 2005).  In the *WorldCom* case the court held:

> In sum, an accountant has responsibility under Section 11 for the accuracy of the financial statements she certifies. An unqualified certification customarily asserts that a company's financial statements present fairly, in all material respects, the financial position of the company in conformity with GAAP. The certification applies to each material statement within the financial statements and to the financial statements taken as a whole.

*Id*.  Plaintiffs also cite *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 399 (S.D.N.Y. 2013), where the same court held that "[a]uditors may not shield themselves from liability under Section 11 merely by using the word 'opinion' as a disclaimer" to their certification.  Both of these decisions pre-date *Omnicare*.

PwC Australia claims that its audit report is subject to the *Omnicare* standard, regardless of whether it is considered a "certification," citing the Second Circuit's recent decision in *In re Puda Coal Sec. Inc. Litig.*, No. 15-2100 (2d Cir. May 20, 2016) (summary order).  Dkt. 89 at 2.  Indeed, the holding in that case directly contradicts Plaintiffs' assertion that PwC Australia is responsible for CBD's financial statements as statements of fact.  In *Puda Coal*, the Second Circuit held that "[a]udit reports, labeled 'opinions' and involving considerable subjective judgment, are statements of opinion subject to the *Omnicare* standard for Section 11 claims."  *Id*. (quoting *Puda Coal*, No. 15-2100  at 5–6).  Plaintiffs contend that *In re Puda Coal* is inapposite because (1) it was an appeal from a dismissal on summary judgment and therefore says nothing about what is necessary to plead a section 11 cause of action against an auditor; and (2) in reaching its decision, the Second Circuit

erroneously relied on a case that involved claims under section 10(b) and section 18. Dkt. 93 at 1–2. Neither of these distinctions persuades this court to reject the Second Circuit's holding.

Moreover, PwC Australia cites three district court opinions that have applied *Omnicare* in section 11 claims against auditors. *See In re Velti PLC Sec. Litig.*, No. 13-cv-03889-WHO, 2015 WL 5736589, at *17–24 (N.D. Cal. Oct. 1, 2015); *In re Lehman Bros. Sec. & ERISA Litig.*, No. 09-md-2017 (LAK), 2015 WL 5514692, at *5–8 (S.D.N.Y. Sept. 18, 2015); *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 1:12-cv-00993, 2015 WL 383349, at *33–34 (M.D. Pa. June 22, 2015). The court adopts the Second Circuit's holding that audit reports, labeled 'opinions' and involving considerable subjective judgment, are statements of opinion subject to the *Omnicare* standard for section 11 claims. In this case, PwC Australia's audit report provides a disclaimer that it is an opinion and it involves subjective judgment. Accordingly, the *Omnicare* standard applies to PwC Australia's audit report.

## C. Embedded Statements of Fact that are Untrue

The court's holding that the *Omnicare* standard applies does not end the inquiry. In *Omnicare*, the Supreme Court held that a defendant can be held liable for an opinion—even if the defendant honestly believed the opinion—if the opinion contains "embedded statements of facts" that are untrue. 135 S. Ct. at 1327. Plaintiffs rely heavily on *In re Petrobras*, where a court denied the auditor defendant's motion to dismiss, holding that the plaintiff adequately alleged two of the "three avenues of liability for statements of opinion under §11" under the *Omnicare* decision: omissions liability and the "embedded statements of fact" theory. *In re Petrobras Sec. Litig.*, No.

24

14-cv-9662 -JSR (S.D.N.Y. Feb. 19, 2016).  In this case, Plaintiffs rely on the "embedded statements

of fact" theory,[3] which the *Petrobras* court summarized as follows:

> One such avenue is that a defendant is liable under §11 if its opinions contained
> "embedded statements of fact" that are untrue.  *Id*. at 1327.  *Omnicare* offered the
> simple example of a CEO stating, "I believe our TVs have the highest resolution
> available because we use a patented technology to which our competitors do not have
> access."  *Id*. The conclusion of the CEO rested on an "underlying fact" of use of
> specific technology.  In much the same way, PwC's audit opinions that "the
> accompanying consolidated [financial] statement[s] . . . present fairly, in all material
> respects, the financial position of [the issuer]" rested on the underlying facts
> contained in the financial statements.   Similarly, PwC stated that its audit opinions
> were based on "examining, on a test basis, evidence supporting the amounts and
> disclosures in the financial statements."  *Id*. The facts of the financial statements
> were embedded in PwC's audit opinions.

*Id*. at 9–10.

The *Petrobras* court reasoned that "PwC's audit opinions that 'the accompanying

consolidated [financial] statement[s] . . . present fairly, in all material respects, the financial position

of [Petrobras]" rested on the underlying facts contained in the financial statements.  *Id*.  Therefore,

the court concluded that all facts contained in the financial statements were embedded in PwC's

audit opinions.  *Id*. at 10.  In this case, PwC Australia's audit opinion in the Offering Documents

contains similar language as the audit opinion in *Petrobras*.   It states that "the accompanying

consolidated [financial] statement[s] . . . present fairly, in all material respects, the financial position

of [CBD]."  Dkt. 72, Ex. 5 at 41.

The *Petrobras* court misreads the "embedded statement of fact" concept discussed in

*Omnicare*.  Dkt. 77 at 7.  In *Omnicare*, the Supreme Court's example of an embedded statement of

fact was:  "I believe our TVs have the highest resolution available because we use a patented

_____

[3]Plaintiffs do not allege that PwC Australia omitted material statements in its audit report.

technology to which our competitors do not have access." *Omnicare*, 135 S. Ct. at 1327. The conclusion of the CEO rested on an underlying, verifiable fact: that the company uses a patented technology that its competitors do not have access to. *Id.* Neither of the two challenged opinions expressed by PwC Australia are accompanied by factual bases of that kind. The numbers in CBD's financial statements, on which PwC Australia expressed an opinion, do not appear in the audit report and are not "embedded" in a subordinate clause in any of PwC Australia's sentences in the way the *Omnicare* Court set out.

PwC Australia's audit report states, in relevant part, "[i]n our opinion . . . [the accompanying financial statements] . . . present fairly, in all material respects, the financial position of CBD Energy Limited and its subsidiaries at June 30, 2013," that "[w]e conducted our audit of these statements in accordance with the standards of the Public Company Accounting Oversight Board," and that "[w]e believe that our audit provides a reasonable basis for our opinion." Dkt. 72, Ex. 5 at 41. Accordingly, the court finds that the audit report does not contain embedded statements of fact that are untrue.

Plaintiffs do not allege that PwC Australia did not subjectively believe any of the opinions it provided in its report, and PwC Australia's opinions do not contain any embedded statements of fact that are untrue. Accordingly, in light of *Omnicare*, Plaintiffs have failed to state a section 11 claim against PwC Australia. Moreover, granting Plaintiffs leave to amend their section 11 claim would be futile. Plaintiffs have expressly disclaimed any allegations of fraud against PwC Australia in their amended complaint. Dkt. 27 at 40, ¶ 163. Additionally, Plaintiffs allege that it was PwC Australia who, in the subsequent year's audit, detected the related party transactions and brought them to CBD's attention. Dkt. 27 at 19–21, ¶ 84–86. These allegations are inconsistent with any

allegations that PwC Australia did not believe the opinions it was providing.  Accordingly, Plaintiffs'

section 11 claim against PwC Australia is DISMISSED WITH PREJUDICE.

## VI. CONCLUSION

Based on the foregoing, the Underwriter Defendants' motion (Dkt. 45) is (1) GRANTED as

to the claims asserted by plaintiffs Mahhmmoud Sakhi and Dmytro Kavchak, and those claims are

hereby DISMISSED WITH PREJUDICE and (2) DENIED as to the Underwriter Defendants'

reasonable reliance argument and the claims asserted by Joseph Pankowski, who is GRANTED leave

to substitute himself as the new lead plaintiff.  Additionally, Pillinger's motion (Dkt. 71) is DENIED

and PwC Australia's motion (Dkt. 72) is GRANTED.  Accordingly, Plaintiffs' section 11 claim

against PwC Australia is DISMISSED WITH PREJUDICE.

Signed at Houston, Texas on July 6, 2016.

_____
Gray H. Miller
United States District Judge